Dennis RUARK, Sr., and Mary Ruark, Appellants,

v.

Don DRURY, Dick Fehr, Leland Boatwright, Cotton Comer, Gregg Reed, and Jasper County, Missouri, Appellees.

No. 93–2648.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1994.

Decided April 4, 1994.

Rehearing Denied May 2, 1994.

214

Counsel who presented argument on behalf of the appellant was Michael W. Manners of Independence, MO.

* The Honorable LYLE E. STROM, Chief Judge, United States District Court for the District of Nebraska, sitting by designation.

1. The Honorable James C. England, United States Magistrate Judge for the Western District

Counsel who presented argument on behalf of the appellee was Jan Y. Millington of Springfield, MO.

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and STROM,* District Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

In September, 1985, Dennis Ruark, Jr., was an inmate at the jail in Jasper County, Missouri. He was 21 years old. When jail guards could not wake him one morning after several tries, they called an ambulance. Mr. Ruark died on the way to the hospital, apparently from a drug overdose.

In September, 1988, Mr. Ruark's parents—Dennis Ruark, Sr., and Mary Ruark—sued for damages in federal court. They alleged a deprivation of their son's constitutional rights by various jail personnel and the county, *see* 42 U.S.C. § 1983, specifically, his right to be free from cruel and unusual punishment under the eighth amendment, made applicable to the states by the fourteenth amendment. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 101–02, 97 S.Ct. 285, 289–90, 50 L.Ed.2d 251 (1976). The Ruarks contended that there had been an intentional delay in calling the ambulance and thus that the jail personnel had exhibited "deliberate indifference to [their son's] serious illness or injury." *Estelle v. Gamble,* 429 U.S. at 105, 97 S.Ct. at 291. The defendants moved for summary judgment. In mid-1993, the trial court granted that motion. The Ruarks appeal. We affirm the judgment of the trial court.[1]

### I.

Dennis Ruark, Jr., left the jail one morning on a work release program. When he returned that evening, he was checked in by Dick Fehr, the assistant warden of the jail. According to Mr. Fehr's deposition testimony, Mr. Ruark's face at that time was "red and flushed." Mr. Fehr further testified that

of Missouri, to whom the case was submitted by consent of the parties. *See, e.g.,* 28 U.S.C. § 636(c)(1).

Mr. Ruark "seemed to be moving a little slower than usual, like somebody that [might] have had the flu or a cold."

The next morning, Cotton Comer, a jail security officer, tried to wake Mr. Ruark "shortly before breakfast," which was usually served around 6:00 a.m., by "holler[ing] for [him] ... to wake up." According to Mr. Comer's deposition testimony, he "[s]hook" Mr. Ruark and "told him it was time to get up." In response, Mr. Ruark "mumbled." After Mr. Comer had served breakfast to the other inmates, "about" 6:00 a.m., he returned to Mr. Ruark's cell, "again hollered" for Mr. Ruark "to get moving ... and ... to get up," and "went in again to shake him." Mr. Comer testified that he was not concerned at that point because Mr. Ruark "always slept hard" and was "[a]lways hard to wake." Don Drury, the jail warden, testified in his deposition that "you couldn't wake up [Mr. Ruark] any morning of the week" and that "security officers [had] even picked the end of his bunk up and dropped it and couldn't wake him up under any conditions under any day of the week." Mr. Drury further testified that "every [jail] security officer that ... was responsible for waking [Mr. Ruark] up" for his work release program had complained that "they could not get him woke up," that "[t]hey'd go back there anywhere from five to six times to shake him and wake him." On one occasion, Mr. Drury stated, he had "even told them to lock [Mr. Ruark] up and forget him, and don't wake him up. If he don't want to get up and go to work, that's his problem."

Around 6:15 a.m., Mr. Comer went to check on Mr. Ruark again. At that time, Mr. Comer "observed [Mr.] Ruark sleeping ... on his back and breathing raspily." Mr. Ruark sounded "[l]ike he was having difficulty breathing" but not like he was "choking." Mr. Comer "shook [Mr.] Ruark's hand and shoulder ... and only got a mumble ... without any other response." At that time, Mr. Comer, who had had no medical training, noticed brown fluid coming from Mr. Ruark's mouth but assumed that Mr. Ruark "had been chewing tobacco," which Mr. Ruark had been known to do sometimes before falling asleep.

Around 6:30 a.m., Mr. Comer returned to Mr. Ruark's cell. He saw Mr. Ruark "lying on his left side and breathing blubberly." He described Mr. Ruark as "breathing very hard" and as "having obvious difficulty breathing." Mr. Comer "again shook" Mr. Ruark, who "mumbled a little." Mr. Comer then turned Mr. Ruark "over on his stomach in view of the blubberly breathing." Mr. Comer again saw brown fluid coming from Mr. Ruark's mouth. Still unable to rouse Mr. Ruark, Mr. Comer became "concerned," thinking that Mr. Ruark had perhaps "swallowed chewing tobacco which ... might cause him to choke to death," and called for help from Gregg Reed, another jail security officer. Mr. Reed came to the cell with a flashlight, which showed that brown fluid was coming from Mr. Ruark's nose as well. At that point, Mr. Comer became "alarmed."

Mr. Reed testified in his deposition that when he was called to Mr. Ruark's cell by Mr. Comer at 6:30 a.m., Mr. Ruark "was laying on his stomach" and "was warm to the touch" but had "labored breathing." Mr. Reed saw brown fluid coming from Mr. Ruark's nose and mouth, "pooling on the floor." Mr. Reed, who had had training as a paramedic, "believed that there was an emergency" and "hurried" "immediately" to the sheriff and reported that they had "a problem in the back of the jail." The sheriff told the dispatcher to call an ambulance.

According to the deposition testimony of Leland Boatwright, the sheriff, "the call was made immediately," "before there was any more talk, in other words to ask why or what was the problem," "before anybody said why, where, and all about it." Sheriff Boatwright was sure that he "inquired immediately" about Mr. Ruark's condition and then "called back" to the ambulance dispatcher "and told them to get there as fast as possible." The dispatch log at the sheriff's office reflects that an ambulance was called for Mr. Ruark at 6:50 a.m. The ambulance service's records reflect that the call was received at 6:51 a.m. The dispatch log at the sheriff's office states that the ambulance arrived at 7:03 a.m. and left for the hospital less than 15 minutes later. Mr. Ruark was subsequently pronounced dead at the hospital, but, accord-

ing to the ambulance attendants, he actually died on the way to the hospital.

Mr. Ruark's parents sued Sheriff Boatwright; Don Drury, the jail warden; Mr. Fehr, the assistant jail warden; and Mr. Comer and Mr. Reed, the security officers at the jail. (We note that the Ruarks' brief on appeal does not offer any arguments specific to Mr. Fehr; since the trial court also remarked that the Ruarks' response to the summary judgment motion of the defendants failed to deal with Mr. Fehr, we conclude that the Ruarks have dropped any claims relating to him.) The Ruarks alleged that all of the individual defendants were personally involved in causing a delay between 6:00 a.m., when Mr. Ruark was first unable to be awakened, and 6:30 a.m., when Mr. Ruark's condition was recognized as an emergency, and between 6:30 a.m. and 6:50 a.m., when an ambulance was called. The Ruarks also alleged that jail personnel should have realized much earlier that Mr. Ruark was seriously ill. The Ruarks sued the county as well, alleging that the failure to train jail personnel with respect to recognizing medical emergencies was directly responsible for Mr. Ruark's death.

## II.

■ It is well settled that an intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the eighth amendment. *See, e.g., Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). To create liability, however, that delay must occur "in the face of information that a reasonable person would know requires action," *Howell v. Evans,* 922 F.2d 712, 720 n. 7 (11th Cir.1991), *vacated on other grounds,* 931 F.2d 711 (11th Cir.1991) (*per curiam* ), *see also id.* at 720 and *Brown v. Hughes,* 894 F.2d 1533, 1537–38 (11th Cir. 1990) (*per curiam* ), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990), or must involve " 'acts or omissions [that are] so dangerous (in respect to health or safety)' that knowledge of the risk can be inferred," *Fruit v. Norris,* 905 F.2d 1147, 1150 (8th Cir.1990), quoting *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988), *cert. denied,* 488 U.S. 823, 109 S.Ct. 68,

102 L.Ed.2d 45 (1988). *See also Miltier v. Beorn,* 896 F.2d 848, 851–52 (4th Cir.1990); *Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); and *Church v. Hegstrom,* 416 F.2d 449, 451 (2d Cir.1969). That delay must also be prompted by "obduracy and wantonness, not inadvertence or error in good faith," *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), before liability may be imposed.

■ In the portion of its opinion granting summary judgment to Cotton Comer, the trial court noted that Mr. Ruark was known to be hard to wake. We note that Mr. Ruark had also been known to fall asleep with chewing tobacco in his mouth and that Mr. Comer described Mr. Ruark's breathing at 6:15 a.m. as "labored" but "not choking."

The Ruarks contend on appeal, however, that Mr. Comer described Mr. Ruark's condition at 6:15 a.m. as "choking and could not breathe" when the Ruarks' investigator interviewed Mr. Comer before Mr. Comer was added as a defendant in the case. The Ruarks also refer to their own depositions, in which each of them denied that their son was hard to wake when he was living at home. Those items of evidence, the Ruarks assert, establish the existence of a genuine issue of material fact, *see* Fed.R.Civ.P. 56(c), Fed. R.Civ.P. 56(e), with respect to whether Mr. Comer should have known as of 6:00 a.m. or 6:15 a.m. that Mr. Ruark was seriously ill, or knew as of 6:30 a.m. of the severity of Mr. Ruark's condition but failed to act appropriately in response.

■ The defendants respond that the investigator's affidavit containing Mr. Comer's alleged description of Mr. Ruark's condition at 6:15 a.m. was not executed until mid–1992, more than three years after Mr. Comer's interview with the Ruarks' investigator and more than six and a half years after the events surrounding Mr. Ruark's death, and is therefore not reliable enough to prevent summary judgment. With respect to the Ruarks' depositions, we note that Mr. Ruark's father stated that although he could "not recall right now" any difficulty in wak-

ing his son, he also stated that he did not personally wake Mr. Ruark when Mr. Ruark was living at home but, rather, that it was Mr. Ruark's mother who customarily did so. We note as well that although Mr. Ruark's mother denied that Mr. Ruark was hard to wake, she also stated that she no longer woke him after his sophomore year in high school but, rather, that Mr. Ruark himself "was responsible to get himself up starting his junior year."

Under those circumstances, we agree with the trial court that the Ruarks have failed to establish the existence of a *genuine* issue of material fact, either with respect to the jail personnel's reported difficulties in waking Mr. Ruark or with respect to his condition at 6:15 a.m. *See, e.g., Cervantes v. Time, Inc.*, 464 F.2d 986, 994–95 (8th Cir.1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973), and *Lundeen v. Cordner*, 354 F.2d 401, 406–08 (8th Cir.1966); *see also* 10A C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure: Civil* 2d § 2727 at 157–70 (1983). Even if we were to hold, moreover, that a genuine issue of material fact existed with respect to Mr. Ruark's condition at 6:15 a.m., we also agree with the trial court that the Ruarks have failed to establish the existence of a genuine issue of material fact with respect to any "obduracy and wantonness," *Whitley v. Albers*, 475 U.S. at 319, 106 S.Ct. at 1084, on Mr. Comer's part that could justify imposing liability upon him under the eighth amendment.

### III.

■ The Ruarks seek to impose eighth amendment liability upon Don Drury, the jail warden, because of his acknowledgment that he once told his jail security officers just to "lock [Mr. Ruark] up and forget him." The Ruarks contend that that remark demonstrates the personal participation in, and tacit approval of, the events prior to Mr. Ruark's death that would subject Mr. Drury to liability as the supervisor of Cotton Comer. *See, e.g., Angarita v. St. Louis County*, 981 F.2d 1537, 1545 (8th Cir.1992); *see also Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir.1990).

In the portion of its opinion granting summary judgment to Mr. Drury, however, the trial court stated that the Ruarks had "failed to tie this statement into the circumstances surrounding the incident in question" and that no evidence was offered to suggest that the statement "was anything more than an off-hand remark made at some other time that had no bearing on the actions or the state of mind of [Mr. Comer] on the morning in question." We have read carefully Mr. Drury's deposition and have considered carefully the arguments of the Ruarks in that respect. In the circumstances of this case, we agree with the trial court that the Ruarks have failed to establish the existence of a genuine issue of material fact with regard to Mr. Drury's personal involvement in the events surrounding Mr. Ruark's death.

### IV.

■ The Ruarks assert that the 20–minute delay between the time when their son's condition was recognized as an emergency and the time when an ambulance was called was attributable either to Gregg Reed's failure to notify Sheriff Leland Boatwright of the emergency immediately or to Sheriff Boatwright's failure to call an ambulance immediately after being notified by Mr. Reed of the need for one. In either case, the Ruarks argue, such a delay must be characterized as a matter of law as "deliberate indifference," *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), *see also id.* at 106, 97 S.Ct. at 292, under the eighth amendment.

In the portion of its opinion granting summary judgment to Mr. Reed, the trial court held that "it cannot be said, as a matter of law, that a twenty-minute delay in securing assistance to have an ambulance called, *in and of itself*, constitutes obduracy and wantonness" (emphasis supplied). In the portion of the opinion granting summary judgment to Sheriff Boatwright, the trial court held that "it cannot be said, as a matter of law, that a twenty-minute delay in calling an ambulance, *without more*," is sufficient to establish that Sheriff Boatwright "acted in callous disregard" of Mr. Ruark's "constitutional right to have medical attention" (emphasis

supplied). In the circumstances of this case, we affirm those holdings of the trial court.

## V.

 Finally, the Ruarks assert that if Cotton Comer had had any training with respect to medical emergencies, he would have been able to tell at an earlier time that Mr. Ruark's condition was life-threatening. The Ruarks urge that "in light of the duties assigned to [the jail security officers,] the need for … training [in that regard] is so obvious, and the [failure to train] so likely to result in the violation of constitutional rights, that the [county] can reasonably be said to have been deliberately indifferent to the need," *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989), *see also id.* at 388–89, 392, 109 S.Ct. at 1204–05, 1206. The Ruarks contend, therefore, that the county's failure to train Mr. Comer in that respect was so "closely related" to Mr. Ruark's death, *id.* at 391, 109 S.Ct. at 1206, as to be "a direct causal link" to that death, *id.* at 385, 109 S.Ct. at 1202, thus justifying the imposition of liability on the county under the eighth amendment.

The circumstances of this case are unusual. Mr. Comer was faced with an inmate who was known to be hard to wake and who was known to have fallen asleep on occasion with chewing tobacco in his mouth. In light of that history—*i.e.*, considering "the constraints facing" Mr. Comer, *Wilson v. Seiter*, 501 U.S. 294, 295, 111 S.Ct. 2321, 2326, 115 L.Ed.2d 271 (1991), *see also Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)—we do not believe that any reasonable person could find that Mr. Comer would have reacted differently even if he had had some training with regard to medical emergencies. With that conclusion, we must hold that the Ruarks have failed to establish the existence of a genuine issue of material fact with respect to a causal connection between Mr. Ruark's death and any lack of training by the county for its jail security officers. We therefore affirm the trial court's grant of summary judgment to the county.

## V.

For the reasons indicated, we affirm the trial court in all respects.