# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1874

_____

| | | |
|---|---|---|
| Karla Olson, as Special Administrator of the Estate of Jeremy J. Gacek, Deceased, | * * * * | |
| Plaintiff - Appellee, | * * | |
| v. | * * | |
| Jeffrey Bloomberg; Keith Ditmanson; Kenneth Hemenway, | * * | |
| | * | Appeal from the United States |
| Defendants, | * | District Court for the |
| | * | District of South Dakota. |
| Thomas Hauglin, | * * | |
| Defendant - Appellant, | * * | |
| Steven Lee; Douglas Weber; Captain Jeff L. Snyder; Captain Greg Knutson; Owen Spurrell; Pete Norris; Dennis Block; Robert Kuemper, | * * * * * | |
| Defendants. | * | |

_____

Submitted: December 11, 2002

Filed: August 11, 2003

_____

Before McMILLIAN, JOHN R. GIBSON, and BYE, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

Thomas Hauglin appeals the district court's order denying him summary judgment on qualified immunity grounds in this 42 U.S.C. § 1983 action filed against him in his individual capacity. Karla Olson filed this action on behalf of her son, Jeremy Gacek, who committed suicide while in the South Dakota State Penitentiary; she alleges that prison officials were deliberately indifferent to Gacek's serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. The district court granted summary judgment to eleven of twelve prison officials in this case, but found that there was a dispute as to the predicate facts surrounding Hauglin's actions during a fifteen to twenty-five minute period after Gacek informed Hauglin that he was going to commit suicide. Hauglin argues that he tried to convince Gacek not to commit suicide and alerted another guard to call a code red, that this conduct did not constitute deliberate indifference, and that therefore, he was entitled to qualified immunity. Based upon 28 U.S.C. § 1291 and the collateral order doctrine, we have jurisdiction over this appeal of the district court's denial of summary judgment on qualified immunity grounds. We affirm the district court's order.

In reviewing this denial of summary judgment, we view the facts in the light most favorable to the non-moving party, Karla Olson, as special administrator of Jeremy Gacek's estate. Jeremy Gacek committed suicide on March 4, 1998, while incarcerated in the Special Housing Unit of the South Dakota State Penitentiary in Sioux Falls, South Dakota. The guards on duty in the Special Housing Unit during the afternoon of Gacek's death included correctional officers Thomas Hauglin and Vern Bormann and senior correctional officer Greg Knutson. In the Special Housing Unit, inmates are continuously confined in their cells except for a period of forty-five minutes for recreation period, commonly referred to as "rec," which they may take once a day, five days a week. During rec, inmates are allowed to take a shower, walk

around the tier, and talk with other inmates who are in their cells. A maximum of two inmates are allowed to be out of their cells during the same rec period. Inmates who are on "status" (i.e. those who have committed disciplinary violations resulting in a forced cell entry within the past year) are only allowed to take their rec until 3:30 p.m. because there are fewer correctional officers on duty after that time. If an inmate is not released from his cell by 2:45 p.m., he will often not receive his rec period and consequently will not take a shower that day.

At approximately 3 p.m., Jeremy Gacek asked Bormann and Hauglin if he could receive his rec period because he wanted to take a shower. Gacek told Bormann that if he was released from his cell, he was going to take the full rec period until 3:45 p.m. Because of previous disciplinary violations, Gacek was "on status," and therefore, was not allowed to be out of his cell after 3:30 p.m. Bormann spoke with Captain Kenneth Hemenway, who directed that Gacek not be given his rec period that day. Both Gacek and his rec partner, inmate Chris Hill, were upset that they did not receive their rec and told their guards that if they did not receive their rec, they would refuse to give their trays back at supper, which would result in a forced cell entry to remove the trays. Hauglin and Bormann contacted Hemenway about Gacek and Hill's threats to not give back their trays. Hemenway told Hauglin and Bormann to give the inmates sack lunches which are served without trays or utensils. When the sack lunches were served, Gacek became verbally abusive and threw water on Hauglin and Bormann through the food port. Bormann later issued a write-up for Gacek's behavior.

Sometime between 4:00 p.m. and 4:30 p.m., Gacek and Hill obtained plastic spoons from fellow inmates and told Hauglin that they had spoons and would not give them up. Gacek then asked whether the cell entry team, referred to as the "goon squad," was coming to retrieve the spoon. Hauglin told Bormann that Gacek and Hill had spoons, and Captain Jeffrey Snyder was contacted about how to deal with this problem. Snyder called Associate Warden Owen Spurrell, who decided that because

Gacek was not harming himself or threatening to harm others with the spoon, the forced cell entry could wait until the following morning when there would be a larger number of officers available.

At approximately 5:30 p.m., Hauglin told Gacek that he would not be assembling a cell entry team to remove the spoon from Gacek's cell. Gacek was upset that the cell entry team was not being put together. Hauglin left the walk behind the cells, and Gacek continued to push his emergency call button. Bormann went home to change his clothes at 5:50 p.m.

The district court found that the record contained disputes of material fact regarding Hauglin's actions between 5:50 p.m. and the time the code red was called at 6:17 p.m. Hauglin described these events in a report written the night of Gacek's suicide and in a deposition taken two years later. In his written report, Hauglin stated:

> At 5:50 Officer Feterl Arrived to relive [sic] Officer Bormann so he could go change cloths [sic]. I took Officer Feterl with me to pick up trays. I told him to stay off the tier on upper west but stand just outside the door to the tier. I entered the tier and picked up trays without incident! At Aprox 6:10pm Inmate Gacek J pushed his call light. I went to the back of his cell and he asked me if the goon squad was on thier [sic] way I told him no. He then said what is it going to take to get the goon squad, I said I didn't know. He then said what it doesnt [sic] matter that we slimed you guys, flooded and will not give up our spoons. I told him I did not know what was going to happen. He then told me he was going to get his shower one way or another, he then asked me if I could get him a shower. I told him I could not make that decision. Inmate Gacek, J then started to take his orange pants off and said fine I am just going to hang myself. I told Inmate Gacek J not to be stupid, his reply was fuck it. He was tying his pant legs into a slip knot. He said he was going to tie one end to his bed and tie his feet to the door. I told Inmate Gacek if he wanted to take on the goon squad that much just give me two minutes and I would go make a call to the Captin [sic] and tell

-4-

him that Inmate Gacek J was threating [sic] to hang himself. I told Gacek J that I would come back and O.C [sic] him and he could take the goon squad on then if he wanted to. He said no fuck it. As soon as you walk away I am going to hang myself and if I do get it done it will be your fuckers fault for fucking me out of my rec.

At this time Inmate Gacek J walked to his door and said good bye to Inmate Hill C and some others that I could not hear. The whole time I was talking to him he was tying his pants to his bed and a towel to his door. He then walked away from his door and said he was was [sic] going to do it. He started to move the slip knot end of his pants twords [sic] his head. At this time I ran off the cat walk and told Officer Bormann to call a code Red, that Inmate Gacek J. was hanging himself. Aprox Time code red was called was 6:17 pm.

Hauglin reaffirmed much of this initial account in his later deposition testimony.[1] Thus, according to Hauglin, he tried to talk Gacek out of committing suicide between 6:10 p.m. and 6:17 p.m., and when Gacek tied his pants into a knot and put them over his head, Hauglin ran from the catwalk and told Bormann to call a code red.[2]

A number of inmates provided testimony which conflicted with Hauglin's account of events. Harold Kilbourn, an inmate in the Special Housing Unit, heard Gacek say that he was going to hang it up and remembered Hauglin responding to

---

[1]In the deposition, Hauglin stated that "from the time he [Gacek] mentioned it [suicide] until he actually started slipping the pants around his neck, I was talking to him, trying to talk him out of it." He estimated that this was between fifteen and twenty five minutes. When asked whether Gacek appeared serious about his threat, Hauglin responded: "I really couldn't say. I mean, at that time he did, and other times he'd just be off and we'd be talking about something totally off the wall that didn't have nothing to do with anything."

[2]Bormann wrote in his informational report that he returned to the Special Housing Unit at 6:10 p.m. and that Hauglin was back on the catwalk at that time. According to Bormann, Hauglin ran off of the catwalk at 6:17 p.m. and told Bormann to call a code red because Gacek was attempting to hang himself.

Gacek, "[Y]ou do what you got to do and I'll do what I got to do." Kelly Brand also recalled: "I did hear somebody back there say, do what you got to do. And I don't know which guard that said that." Kilbourn testified that he heard Hauglin walk down the catwalk and heard a door shut. Dan Cady, another inmate and friend of Gacek's, remembered Hauglin telling Gacek something to the effect of "let me go call somebody. Let me talk to somebody. I'll be right back." Cady claimed that this conversation occurred at approximately 5:50 or 5:55 p.m. and that Hauglin subsequently left the catwalk.[3] Inmate Chris Hill, who was in the cell next to Gacek's, testified that Gacek told Hauglin he was "going to hang it up" and that Hauglin told Gacek: "[W]ell, come on Gacek. Just give me a minute. I'll be right back. Give me a minute and let me call somebody. I'll be right back." According to Hill, Gacek said, "[W]hen you come back I'll probably be hanged up." Hill stated that Hauglin then left the catwalk. Hill and three other inmates, Kelly Brand, Kurt Angelone, and Anthony Salinas, all recounted that shortly after Hauglin left, Gacek stopped responding to their questions and that they began pushing their emergency buttons, banging on their doors, and yelling for the guards. This occurred for some period of time between fifteen and twenty-five minutes before any of the guards appeared.[4] According to Hill, the guards were not responsive to their calls for help:

> Nobody even came on the catwalk. I got up there, started yelling. Everybody in that pod was yelling, screaming, get somebody back here. Got somebody hanging. Gacek is hanging. Get somebody back here now.
> I pushed my button. Same thing. Went off the same way. They never came back. It shut off and they never – they never came back.

---

[3]Cady also estimated that the officers returned to the catwalk at 6:27 p.m. and entered Gacek's cell at 6:42 p.m. These estimates differed from the time recorded on the videotape filed by the plaintiffs which showed the officers standing on the catwalk at 6:25 p.m. and entering the cell at 6:28 p.m.

[4]The time that it takes to commit suicide by strangulation is between four and six minutes. At least four of the defendants, though not Hauglin, testified that they were aware a person can die by strangulation in four to ten minutes.

You know what their response was?  Their response was, we couldn't hear you the guys?

After Hauglin and Bormann called the code red, they began preparing for a cell entry.  A videotape of the cell entry, filed by the plaintiff, shows the events from 6:25 p.m. to 6:49 p.m.  At 6:28 p.m., the cell was opened and a guard carrying a body shield entered the cell followed by Captain Snyder and several other officers.  Members of the fire department arrived at 6:40 p.m., and the paramedics arrived at 6:49 p.m.  Gacek did not respond to any of the resuscitation attempts and was pronounced dead at approximately 7:20 p.m.

I.

Ordinarily, a denial of summary judgment is not a "final" decision and is therefore not immediately appealable.  See 28 U.S.C. § 1291; Pace v. City of Des Moines, 201 F.3d 1050, 1052 (8th Cir. 2000).  However, the Supreme Court has recognized that the question of qualified immunity (i.e. whether the facts alleged support a claim of violation of clearly established law) is separate from the merits of the underlying action for purposes of the collateral order doctrine.  Mitchell v. Forsyth, 472 U.S. 511, 528-29 (1985).  Therefore, "a district court's denial of a claim of qualified immunity, to the extent it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."  Id. at 530.[5]

_____

[5]Qualified immunity is not a mere defense to liability, but instead an entitlement not to stand trial under certain circumstances.  Because of the many costs associated with subjecting officials to the risks of trial, see generally Harlow v. Fitzgerald, 457 U.S. 800, 816-17 (1982), the Supreme Court has repeatedly stressed the importance of resolving immunity questions at the earliest possible stage in litigation.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991) (citations omitted).

A government official is shielded by qualified immunity from suit for damages if a reasonable official could have believed his or her conduct to be lawful, in light of clearly established law and the information possessed by the official. See Anderson v. Creighton, 483 U.S. 635, 641 (1987). "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994) (citations omitted).

II.

A prisoner's Eighth Amendment rights are violated if prison officials show "deliberate indifference" to the prisoner's "serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Section 1983 claims arising out of inmate suicide cases have been analyzed in terms of prison officials' failure to provide appropriate medical care, so "'deliberate indifference has become the barometer' by which these claims are tested." Bell v. Stigers, 937 F.2d 1340, 1343 (8th Cir. 1991) (quoting Popham v. City of Talladega, 908 F.2d 1561, 1563 (11th Cir. 1990)). A prison official may be held liable under the Eighth Amendment for deliberate indifference only if he or she (1) knows that the inmate faces "a substantial risk of serious harm" and (2) "fail[s] to take reasonable measures" to abate that risk. Farmer v. Brennan, 511 U.S. 825, 847 (1994).[6]

---

[6]We have observed that deliberate indifference claims against prison officials in inmate suicide cases have arisen under two factual circumstances. See Rellergert v. Cape Girardeau County, 924 F.2d 794, 796 (8th Cir. 1991). First, there have been deliberate indifference claims in which the jailers allegedly failed to discover the inmate's suicidal tendencies. See, e.g., Hott v. Hennepin County, 260 F.3d 901, 905-06 (8th Cir. 2001). Second, there have been deliberate indifference claims where jailers knew about suicidal tendencies but allegedly failed to take reasonable preventive measures. See, e.g., Yellow Horse v. Pennington County, 225 F.3d 923, 927 (8th Cir. 2000). Olson's claim would likely be classified in the latter category.

According to the district court, there were three questions of disputed fact which, if resolved in Olson's favor, would serve as evidence of deliberate indifference and preclude Hauglin from being entitled to qualified immunity. First, after Gacek said he was going to "hang it up," there was a dispute as to whether Hauglin responded: "[Y]ou do what you got to do and I'll do what I got to do." Second, there was conflicting testimony as to whether Hauglin left the catwalk for a period of fifteen to twenty-five minutes after Gacek told him he intended to commit suicide. Third, there was a dispute as to whether or not Hauglin returned to the catwalk after numerous inmates began pressing their emergency buttons and yelling for someone to help Gacek before he hanged himself.

Hauglin claims that the district court's decision is inconsistent with our decision in Gregoire v. Class, 236 F.3d 413 (8th Cir. 2000). In Gregoire, 236 F.3d at 415, the estate of inmate George Bouska sued prison officials for deliberate indifference in failing to prevent Bouska's suicide. The plaintiff alleged that Butch Joffer, the case manager in Bouska's cell block, showed deliberate indifference by not checking on Bouska until approximately forty minutes after Joffer received notice of Bouska's intent to commit suicide.[7] Id. at 416. Addressing Joffer's conduct, we observed:

> In evaluating an official's response to a known suicide risk, we should be cognizant of how serious the official knows the risk to be. Our cases indicate that a single phone call to an official who has no other reason

---

[7]Bouska's ex-wife had called Joffer at 12:19 p.m. and told him that a few minutes earlier, Bouska had called her and said he was going to kill himself. Gregoire, 236 F.3d at 416. She asked Joffer to check on Bouska and reassure him that she would not prevent Bouska from seeing his daughters. Id. After hanging up the phone, Joffer wrote out a brief report, pulled Bouska's case file and read it, and spoke with several inmates who stopped by his office. Id. Joffer then paged Bouska at 1:05 p.m. asking him to come to his office. At 1:12 p.m., Bouska's cell mate returned to the cell and found that Bouska had hanged himself. Id.

to think an inmate is a suicide risk, most likely does not create a strong likelihood that infliction of self-harm will result.

Id. at 418 (citing Bell v. Stigers, 937 F.2d at 1344; Lambert v. City of Dumas, 187 F.3d 931, 938 (8th Cir. 1999)). We emphasized that deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct. See Gregoire, 236 F.3d at 419 ("we cannot characterize Joffer's subsequent actions as deliberately indifferent. They are at most negligent."); see also Rellergert v. Cape Girardeau County, 924 F.2d 794, 797-98 (8th Cir. 1991) ("the jury might reasonably conclude that [jailor] Bedell acted imprudently, wrongly, or negligently. However, as a matter of law, we conclude that this evidence cannot permit the conclusion that Bedell acted with deliberate indifference."); Williams v. Kelso, 201 F.3d 1060, 1065 (8th Cir. 2000) ("At best, plaintiff's proof in this appeal amounts to negligent conduct, not deliberate or willful conduct on [the jailors'] part.").

There are important distinctions between Joffer's alleged knowledge and conduct in Gregoire and that of Hauglin. The first key difference is the level of actual knowledge possessed by the prison official at the time of his response. The Gregoire court emphasized that prior to the phone call from Bouska's ex-wife, Joffer had interacted with Bouska and had no reason to believe that Bouska was a suicide risk. Gregoire, 236 F.3d at 416. Furthermore, the phone call from Bouska's ex-wife gave Joffer the impression that Bouska's ex-wife was most concerned with relaying the message that she would not prevent Bouska from seeing his children, not the message that Bouska was actually going to commit suicide. Id. at 418, n.3. Thus, in Gregoire, we held that as a matter of law, Joffer did not have actual knowledge that there was a substantial likelihood that the inmate would inflict harm upon himself; therefore, the delay in Joffer's response did not constitute deliberate indifference. In Hauglin's case, on the other hand, there was direct, first-hand communication from Gacek to Hauglin of Gacek's intent to commit suicide and the method by which Gacek intended to carry out his threat. These alleged facts are sufficient to show that Hauglin knew firsthand of a "substantial risk of serious harm," Farmer, 511 U.S. at 847, knew it was

-10-

an immediate threat, and saw that Gacek had selected a method and had equipment at hand.

Second, there were no allegations of intentional delay in Gregoire. Joffer was alleged to have taken forty minutes writing a report and reading through Bouska's file before intervening, conduct which served as evidence that he underestimated the suicide risk, but not that he "completely disregarded" it. 236 F.3d at 416, 418.[8] In this case, Olson has alleged that Hauglin encouraged Gacek's behavior and then refused to return to the catwalk to help. After Gacek said he was going to "hang it up," Hauglin is alleged to have said, "[Y]ou do what you got to do and I'll do what I got to do," a statement from which the jury could infer deliberate indifference. According to several inmates, Hauglin purposefully left and stayed away from the catwalk, even as they pressed their emergency buttons and yelled for the guards to come help.[9]

---

[8]The court explained, "If an official completely disregarded a phone call such as [Bouska's ex-wife's], alerting the official to a suicide risk, such act may well constitute deliberate indifference. However, Joffer did take some action to respond to the risk." 236 F.3d at 418.

[9]An analogous set of facts may be found in Rodgers v. Chapleau, 238 F.3d 423, 2000 WL 1785837 (6th Cir. 2000) (unpublished per curiam), a case which is not precedential yet which is nonetheless instructive. In Rodgers, an inmate witness testified that at approximately 9:00 or 10:00 p.m., Rodgers told the guard on duty that he was going to hang himself, and the guard responded, "Wait until my shift ends." Id. at *1. According to the inmate witness, Rodgers repeated his threat at 11:35 p.m., ten minutes before the shift was going to end, and the guard told him, "Wait until tomorrow and talk to the psychiatrist." Id. After the guard left, at shift change, Rodgers hanged himself. Id. Everyone in the cell block started yelling for help, but no guard appeared until about fifteen minutes later. Id. At that time, the new guard discovered Rodgers hanging in his cell. Id. The Sixth Circuit held that these allegations were sufficient to create genuine issues of fact as to whether the first guard was aware of the risk of serious harm to the inmate and whether he consciously disregarded it. Id. at *4. The court explained that viewing the facts in the light most favorable to the plaintiff, (1) the guard had first-hand knowledge of the inmate's

Hauglin's second argument is that he took affirmative steps to respond to Gacek's suicide threat, so that even assuming the factual disputes that the district court held determinative, his conduct was not unreasonable as a matter of law and should entitle him to qualified immunity.[10] Hauglin's response to Gacek's threat included talking with Gacek and trying to convince him not to commit suicide and telling Bormann to call a code red emergency. It is undisputed that Hauglin took some measures in response to Gacek's threat. However, taking the facts in the light most favorable to Olson,[11] there is also evidence of intentional delay (allegations that Hauglin said, "do what you have to do," left the catwalk, and refused to return for fifteen to twenty-five minutes). As we stated in Tlamka v. Serrell, 244 F.3d 628, 633

_____

intent to commit suicide; (2) despite the inmate's alleged statements, the guard took no precautions to help him; and (3) the guard failed to respond to the prisoners' general outcry even though moments earlier, the inmate had informed the guard of his suicidal desire. Id. Similarly, in Hauglin's case, taking the facts in the light most favorable to Olson, there is evidence that Hauglin had first-hand knowledge of Gacek's intent, that despite Gacek's threats, Hauglin left the catwalk, and that according to the testimony of a number of inmates, Hauglin failed to respond when they pressed their emergency buttons and yelled for help.

[10]In addition, Hauglin argues that the district court erred in holding that there was a dispute of fact as to whether Hauglin failed to recognize or discover Gacek's suicidal tendency, but that there was no dispute of fact as to whether Hauglin failed to intervene. However, the district court explained these contradictory results as follows: the dispute of fact was over the period from 5:50 p.m. to 6:17 p.m. and included questions about Hauglin's knowledge and his response to Gacek's threat to hang himself and whether this conduct constituted deliberate indifference; the court granted Hauglin's summary judgment motion on the failure to intervene claim insofar as it was alleged that Hauglin failed to intervene in the period after he called the code red at 6:17 p.m.

[11]At this stage of the litigation, we must take the facts as recited in the depositions of the various inmates as being true. See Tlamka v. Serrell, 244 F.3d 628, 634 (8th Cir. 2001).

-12-

(8th Cir. 2001): "It is well settled that an intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the eighth amendment." (quoting Ruark v. Drury, 21 F.3d 213, 216 (8th Cir. 1994)). We recognize that for a delay in medical care to rise to an Eighth Amendment actionable level, the prison official must be aware of information "such that a reasonable person would know that the inmate requires medical attention." Tlamka, 224 F.3d at 633. In this case, if Hauglin knew that there was a substantial risk of serious harm to Gacek because of Gacek's direct communication to Hauglin of his present intent to commit suicide and his chosen method; and if Hauglin deliberately disregarded the risk of Gacek committing suicide by encouraging him to do so, leaving the catwalk, and refusing to return when other inmates tried to inform him of Gacek's hanging, then his conduct would rise to an Eighth amendment actionable level.

## III.

For the reasons stated herein, the district court's denial of summary judgment to Thomas Hauglin on this 42 U.S.C. § 1983 action filed against him in his individual capacity for deliberate indifference to Jeremy Gacek's serious medical needs is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.