# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3110

_____

Rick Plemmons,                          *
                                        *
        Plaintiff-Appellee,       *
                                        *   Appeal from the United States
    v.                                 *   District Court for the
                                        *   Western District of Missouri.
J. T. Roberts, Pulaski County Sheriff;  *
The County of Pulaski, Missouri;        *
Ronald Jones; Michael Gibbens,          *
                                        *
        Defendants-Appellants.    *

_____

Submitted: February 17, 2006
Filed: March 3, 2006

_____

Before LOKEN, Chief Judge, LAY and SMITH, Circuit Judges.

_____

LAY, Circuit Judge.

Rick Plemmons brought action under 42 U.S.C. § 1983 alleging Sheriff J.T. Roberts, jailer Michael Gibbens, jailer Ronald Jones, and Pulaski County, Missouri ("Defendants") violated his constitutional rights by showing deliberate indifference to his medical needs while he was an inmate in the Pulaski County Jail. Specifically, Plemmons argues jailers Gibbens and Jones inexcusably delayed in summoning an ambulance even though Plemmons had told them he had a history of heart trouble, then began exhibiting obvious heart attack symptoms. Plemmons also argues Pulaski

County failed to properly train Gibbens and Jones to deal with such an emergency. Finally, Plemmons alleges the jailers' delay in calling an ambulance was influenced by Sheriff Roberts' policy requiring his personal authorization for ambulance transfers. The Defendants brought a motion for summary judgment on the grounds of qualified immunity, which the district court[1] summarily denied. Defendants now appeal. We affirm.[2]

I.

Rick Plemmons was arrested on August 10, 2002 for allegedly failing to pay child support. Plemmons was forty-six years old at the time. On August 12, 2002, Plemmons was transferred to the Pulaski County Jail, where he was booked between 10:00 and 11:00 a.m. Plemmons alleges he advised jailer Michael Gibbens he had a history of heart problems and had experienced two heart attacks. However, the intake form filled out by Gibbens does not mention Plemmons' history of heart problems. According to Plemmons, on the afternoon of August 12, he began suffering chest and arm pain and was sweating profusely. He stated he does not know the precise time his symptoms began, but he believes they started shortly before 4:00 p.m.[3] He claims his cell-mate, John Thompson, notified jail staff that Plemmons was ill a number of times via a "call box" in their cell, and that "Mike," one of the jailers,

---

[1]The Honorable Scott O. Wright, United States Judge for the Western District of Missouri.

[2]On appeal, Plemmons moved to supplement the record with the deposition of jail inmate Herbert Alan Dodd. Because we conclude the district court properly denied summary judgment on the basis of the record without Dodd's testimony, we find it unnecessary to rule on Plemmons' motion.

[3]The inmates at the jail were not allowed to keep watches, and no clock is visible from their cells. Thus, they could only estimate when Plemmons' attack occurred and the time that passed between events.

came to check on Plemmons around 4:00 p.m. Plemmons claims he told "Mike" he was having heart trouble, but states the jailer left without doing anything. Plemmons' condition worsened, and he experienced increased chest pain and nausea. Plemmons alleges that "Mike" and an unidentified jailer came back twenty-five minutes after "Mike's" first visit, and Plemmons told them he thought he was having a heart attack. Plemmons claims the two jailers then took him to the booking area and had him sit on a bench while they finished processing a prisoner. One of the jailers then called to have an ambulance dispatched, which Plemmons claims was roughly ten to fifteen minutes after he was removed from his cell, and more than fifty minutes from the time the jailers were first notified of his condition.

In his deposition, Thompson, Plemmons' cell-mate, offered a slightly different version of events. According to Thompson, Plemmons became ill around 4:00 p.m. Thompson stated he believed Plemmons was having a heart attack and tried to alert jailer Ron Jones by pushing the call box button in the cell, but received no response. Thompson stated that about fifteen to twenty minutes later, Jones walked by the cell and Thompson told Jones that Plemmons was ill, but Jones dismissed Plemmons' symptoms as an anxiety attack before walking away. When Jones walked by a short time later, Thompson told him Plemmons was having a heart attack, and Jones called to have an ambulance dispatched.

The Defendants point out many of the assertions made by Plemmons are contradicted by the jailers on duty that day. Gibbens stated in his deposition he left work at 4:00 p.m. on August 12 and had no personal recollection of Plemmons' heart attack. Jones stated he promptly went to Plemmons' cell after the jail trustee, Charles Eoff, notified him Plemmons was having trouble breathing. He stated he then took Plemmons to the front of the jail, where he immediately called to have an ambulance dispatched. Jones denied he was notified of Plemmons' condition via the call box in Plemmons' cell and stated he did not know Plemmons was having a heart attack, as he recalled Plemmons complaining only of having difficulty breathing. Jail trustee

Eoff corroborated Jones' statement that he (Eoff) notified Jones of Plemmons' illness and that Jones promptly checked on Plemmons, then summoned an ambulance.[4]

Dispatch records indicate an ambulance was called at 4:51 p.m. and arrived at the jail at 4:56. One of the paramedics stated Plemmons was "in trouble" when the ambulance arrived, and that Plemmons stated he had been "like this" for forty-five minutes. Plemmons suffered from a severe heart attack, and Dr. William Woods observed in his deposition that damage to Plemmons' heart could have been minimized had he received medical care sooner.

Plemmons also has submitted evidence indicating the jailers' delay in calling an ambulance was influenced by Sheriff J.T. Roberts' policy requiring jailers to notify him before an ambulance is summoned to transport an inmate to the hospital. The record indicates Gary Carmack, Pulaski County Ambulance District Administrator, had previously criticized Roberts for delaying inmate treatment and that Carmack had ordered his paramedics to document the occasions when, as a result of Roberts' policy, patients at the jail were not permitted to be transported from the jail by ambulance against the medical advice of physicians.

Plemmons also has submitted evidence indicating Pulaski County failed to adequately train Jones and Gibbens to respond to Plemmons' heart attack, pointing out Jones stated in his deposition he had never seen the Jail Policy and Procedures

---

[4]Eoff's testimony significantly contradicts Jones' testimony on a number of fronts, however. For example, while Jones claimed Plemmons walked with little assistance to the front of the jail to wait for the ambulance, Eoff stated Plemmons collapsed in the hall outside his jail cell, where he was treated by paramedics before being transported to the hospital. Eoff also stated Plemmons complained of chest pain, contradicting Jones' testimony that Plemmons complained only of difficulty breathing. Eoff also claims he directly told Jones that Plemmons believed he was having a heart attack.

Manual and that it was not in use at the time of Plemmons' heart attack. Neither Jones nor Gibbens had received training from Pulaski County to assist them in identifying heart attack symptoms, and, according to Plemmons, neither recognized symptoms obvious to a lay person.

II.

The doctrine of qualified immunity protects governmental officials from civil liability when "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sexton v. Martin, 210 F.3d 905, 909 (8th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In ruling on a qualified immunity issue, courts must apply a two-part inquiry. First, a court must determine whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). If a "violation [can] be made out on a favorable view of the parties' submissions," the reviewing court must then ask whether "the right was clearly established . . . . in light of the specific context of the case." Id. "For a right to be considered clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1103 (8th Cir. 2004) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

We review a district court's denial of summary judgment *de novo*. Hudson v. Norris, 227 F.3d 1047, 1050 (8th Cir. 2000). Ordinarily, a denial of summary judgment is not a final decision and thus is not immediately appealable. Id.; see 28 U.S.C. § 1291. However, a denial of summary judgment on qualified immunity may be reviewed on interlocutory appeal "when the issue presented 'is a purely legal one: whether the facts alleged . . . support a claim of violation of clearly established law.'" Hudson, 227 F.3d at 1050 (quoting Mitchell v. Forsyth, 472 U.S. 511, 528 n.9

(1985)).  Because qualified immunity is "an immunity from suit rather than a mere defense to liability," Hunter v. Bryant, 502 U.S. 224, 227 (1991), its availability "ordinarily should be decided by the court long before trial."  Id. at 228.  However, "the nonmoving party is still given the benefit of all relevant inferences at the summary judgment stage, and if a 'genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground.'"  Hudson, 227 F.3d at 1050 (quoting Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000)); see also Fed. R. Civ. P. 56 (c).

Here, the district court denied the Defendants' motion for summary judgment on the ground of qualified immunity, stating, "there are material facts in dispute that must be resolved by a jury."  To affirm this conclusion, we must first find the evidence in the record, when viewed in the light most favorable to Plemmons, would allow a reasonable fact finder to conclude the Defendants engaged in a course of conduct that violated his clearly established constitutional rights.  We must then find as a matter of law that no reasonable official could have thought that such a course of conduct was lawful.

III.

A.

We first ask whether the evidence in the record, viewed in the light most favorable to Plemmons, would lead a reasonable fact finder to conclude the Defendants engaged in a course of conduct that violated Plemmons' clearly established constitutional rights.  "The Eighth Amendment prohibits prison officials' cruel and unusual punishment of inmates . . . ."  Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001).  This prohibition against cruel and unusual punishment has been interpreted as obligating prison officials to provide inmates in their custody with medical care.  Id.  A prison official violates an inmate's right to medical care if his

or her conduct amounts to a "deliberate indifference to [the prisoner's] serious medical needs." Id. (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To establish a claim of deliberate indifference, an inmate must show "'(1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Id. (quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)).

In Ruark v. Drury, 21 F.3d 213, 216 (8th Cir. 1994), we observed "[i]t is well settled that an intentional delay in obtaining medical care for a prisoner who needs it may" violate the Eighth Amendment. For delay to create an actionable Eighth Amendment violation, however,

> the information available to the prison official must be such that a reasonable person would know that the inmate requires medical attention, or the prison official's actions (or inaction) must be so dangerous to the health or safety of the inmate that the official can be presumed to have knowledge of a risk to the inmate.

Tlamka, 244 F.3d at 633; see also Ruark, 21 F.3d at 216.

Although the facts in Tlamka differ from the facts here, they are sufficiently similar to provide guidance in determining whether the alleged conduct of the Defendants in this case amounted to deliberate indifference to Plemmons' serious medical needs. In Tlamka, Frank J. Tlamka suffered a heart attack while in the custody of prison officials and later died. 244 F.3d at 630. His family brought a § 1983 claim, alleging prison officials ordered inmates who were performing cardiopulmonary resuscitation ("CPR") on Tlamka to desist, despite the fact that Tlamka appeared to be responding favorably. Id. at 630-31. The officials' alleged order resulted in Tlamka going without necessary medical care for up to ten minutes, while his condition noticeably deteriorated. Id. at 631. We first observed that the parties agreed Tlamka's medical condition was objectively serious, as it was obvious

-7-

to those present his condition was life threatening.  Id. at 633.  Thus, we focused our analysis on whether the prison officials actually knew of Tlamka's needs, but deliberately disregarded them.  Although"somewhat wary" of the allegation that prison officials stood idle for ten minutes while Tlamka's condition worsened, we emphasized that "[a]t this stage of the litigation . . . we must accept the facts as recited in the affidavits filed by the prisoners as true."  Id. at 634.  Accordingly, we held the prison officials' alleged failure to act, given the obvious nature of Tlamka's condition and the fact that corrections officers could have provided CPR, was conduct "sufficiently severe to evidence an Eighth Amendment violation."  Id. at 633.

In this case, the Defendants assert Plemmons did not suffer objectively serious medical needs.  However, Plemmons alleges he told the booking officer he was a heart patient, and, roughly six hours later began experiencing classic heart attack symptoms, including arm and chest pain, profuse sweating, and nausea—symptoms corroborated by his cell-mate, John Thompson.  Viewing the facts in the light most favorable to Plemmons, we conclude he has established that a genuine fact dispute exists regarding whether he suffered objectively serious medical needs.

We next turn to the question of whether the Defendants actually knew of but deliberately disregarded Plemmons' objectively serious medical needs.  Plemmons and Thompson allege the jailers were summoned via the call box when Plemmons grew ill, but the call was ignored.  Thompson alleges that, when the jailer finally appeared, he dismissed Plemmons' symptoms as an "anxiety attack" and left.  Plemmons alleges that twenty-five minutes later, two jailers returned, at which time Plemmons requested an ambulance because he believed he was having a heart attack.  According to Plemmons, he was then taken to the booking area and was left to wait another ten to fifteen minutes before an ambulance was summoned.  Plemmons argues this delay was caused, in part, by a policy implemented by Sheriff J.T. Roberts requiring that all ambulance transfers be approved directly by him.  Plemmons also asserts the jailers' failure to provide appropriate medical care was caused, in part, by

Pulaski County's failure to train Gibbens and Jones to recognize heart attack symptoms that would be obvious to a lay person.

There is considerable disparity in the testimony of Plemmons, Thompson, and the jailers regarding a number of issues, including whether Gibbens was on duty during Plemmons' heart attack and, more importantly, how much time elapsed between when Plemmons initially notified the jailers of his condition and when an ambulance was called. Viewing the record in the light most favorable to Plemmons, we conclude genuine issues of material fact are in dispute regarding whether Plemmons notified Gibbens that he had a history of heart problems, whether Gibbens was on duty when the jailers were apprised of Plemmons' condition, whether they failed to recognize heart attack symptoms that would be obvious to a lay person, whether they acted promptly to provide necessary medical help, whether they were properly trained to deal with such an emergency, and whether their conduct was influenced by Sheriff Roberts' policy requiring authorization for ambulance transfers. In sum, viewing the facts in the light most favorable to Plemmons, he has established genuine issues of material facts are in dispute regarding whether the Defendants actually knew of, but deliberately disregarded, his medical needs. See Tlamka 244 F.3d at 634.

The Defendants rely heavily on our statement in Ruark that "it cannot be said, as a matter of law, that a twenty-minute delay in calling an ambulance, without more, is sufficient to establish" a prison official acted in callous disregard of the prisoner's constitutional right to medical attention. 21 F.3d at 217 (citation and quotation omitted). In Ruark, the depositions of the corrections officials indicated that once it was determined an ambulance was necessary, the officials acted immediately, "before anybody said why, where, and all about it." Id. at 215. Apparently, however, it nonetheless took twenty minutes for the dispatcher to be called. We concluded that "without more," the twenty-minute delay between realizing an ambulance was necessary and calling one was not sufficient to establish an Eighth Amendment

violation. The case at hand, however, involves direct allegations the jailers were told of Plemmons' history of heart problems, did not respond to notice via the call box that Plemmons was severely ill, then dismissed Plemmons' obviously severe symptoms as an "anxiety attack." The facts as we must take them indicate the jailers then delayed in returning to check on him for somewhere between fifteen and twenty-five minutes. Plemmons also alleges the jailers left him to wait in the booking area for another ten to fifteen minutes before finally summoning an ambulance. Thus, Plemmons alleges deliberate delay that ignored the obvious severity of his condition, facts that did not exist in Ruark. In Ruark, it was not obvious to the jailers that the inmate in question was ill, as he had been difficult to wake on a number of previous occasions. However, once jail personnel realized the inmate needed medical care, they directly sought to summon an ambulance. Thus, the delay in Ruark is distinguishable from the delay alleged here.

## B.

Having concluded that, viewing the evidence in the light most favorable to Plemmons, he has presented sufficient facts to establish an underlying violation of his Eighth Amendment rights, we must address whether the violation was one of clearly established law. Saucier, 533 U.S. at 201. As noted above, to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 483 U.S. at 640.

In Tlamka v. Serrell, *supra*, we held as a matter of law that corrections officers' alleged delay in providing medical care to a heart attack victim whose condition was obviously life threatening constituted conduct that violated clearly established law, stating

> [w]hile the determination of whether that delay is constitutionally actionable depends on the seriousness of an inmate's medical condition

-10-

and on the reason for the delay, we conclude that under the facts we are presented with in this summary judgment appeal, any reasonable officer would have known that delaying Tlamka's emergency medical treatment for 10 minutes, with no good or apparent explanation for the delay, would have risen to an Eighth Amendment violation. [Tlamka's] factual assertions, in our view, if proven to be true, would constitute a quintessential case of deliberate indifference to serious medical needs.

244 F.3d at 635 (citation omitted).

In the case at hand, Plemmons alleges he notified Gibbens he was a heart patient. It was patently clear to Plemmons, Thompson, and Eoff that he was having a heart attack. Plemmons and Thompson asked for assistance for at least fifteen to twenty minutes, but possibly for as long as fifty-one minutes. Given the facts as we must take them, we conclude any reasonable officer would have known that a delay in providing prompt, appropriate medical care to Plemmons constituted an Eighth Amendment violation.

## IV.

Viewing the evidence in the record in the light most favorable to Plemmons, we hold a reasonable fact finder could conclude the Defendants violated his clearly established constitutional rights by disregarding his need for medical care, particularly considering Plemmons' allegation that he stated he was a heart patient and in light of the obviousness of his symptoms. We further hold, given the facts as we must take them, that no reasonable official could have thought the failure to summon immediate medical help for Plemmons was lawful. Accordingly, we affirm the district court's denial of summary judgment.

_____