**PANAVIEW DOOR & WINDOW CO., a corporation, Appellant,**

v.

**REYNOLDS METALS COMPANY, a corporation, Appellee.**

**No. 15059.**

United States Court of Appeals Ninth Circuit.

Feb. 21, 1958.

Rehearing Denied April 28, 1958.

Macbeth & Ford, Thomas P. Mahoney, Patrick H. Ford, Los Angeles, Cal., for appellant.

Adams, Duque & Hazeltine, Henry Duque, Lawrence T. Lydick, James S. Cline, Los Angeles, Cal., for appellee.

Before FEE and HAMLEY, Circuit Judges, and CHASE A. CLARK, District Judge.

JAMES ALGER FEE, Circuit Judge.

This diversity suit involves the asserted improper use by Reynolds Metals Company of dies alleged to have been made solely for Panaview Door & Window Co. In three causes of action, alternatively pleading breach of contract, violation of a confidential relationship, and unfair competition, Panaview sought damages and injunctive relief.

After a nonjury trial, judgment was entered for defendant. On this appeal, Panaview questions the findings of fact and conclusions of law of the trial court concerning each of the causes of action.

Panaview is engaged in the business of producing and selling aluminum sliding glass doors. The company does not manufacture the component parts of these doors, but assembles the doors from parts purchased elsewhere.

In the spring of 1954, Panaview conceived and developed a sliding glass door, to which it applied the name "Panador." Construction of these doors required the use of aluminum extrusions in various sizes and shapes. An aluminum extrusion is a shape which is formed by forcing a hot billet of aluminum through a die by the use of a large press.

Panaview engineers prepared drawings of the extrusions required in the manufacture of Panadors. From these drawings, blueprints were made. In the late spring of 1954, representatives of Panaview and Reynolds discussed the manufacture of these extrusions and of the dies which would be needed. Reynolds is a large producer of aluminum in its various forms, including aluminum extrusions.

At the time of these discussions, Reynolds was furnished with the Panaview blueprints referred to above. The blueprints were then processed by the extrusion department of Reynolds, extrusion section drawings being made and special assembly tolerances being added. Final drawings were then submitted to and approved by Panaview.

Panaview placed its first order with Reynolds for Panador extrusions on April 20, 1954. Additional orders were placed in July, September and December, 1954. Panaview paid Reynolds approximately $72,670.00 for the extrusions supplied under these orders. The final shipment on the last order was made on May 31, 1955.

During 1954, Windsor Supply, Inc.,[1] was one of the best customers of Panaview, buying complete knocked-down doors, which were then sold under the Windsor label. Late that year, Windsor began negotiations with Reynolds, with a view of purchasing the aluminum components necessary to the production of sliding doors. At least one of the reasons for these negotiations was that Panaview

---

1. For present purposes, Windsor Supply, Inc. (Windsor) will be taken to include Windsor Manufacturing, Inc.

was questioning the credit of Windsor, and, for that reason, was threatening to stop shipments.

As a part of its negotiations with Reynolds, Windsor submitted to that company samples of the various products for which extruded shapes were desired. Included in the samples so furnished was a Panador. Reynolds furnished price quotations on the basis of these samples. Windsor then placed an order with Reynolds for aluminum materials, including extrusions, to be used in manufacturing sliding glass doors similar to Panador.

When the Windsor order was received in the extrusion department of Reynolds, it was seen that the dies called for were the same as those which had been ordered by Panaview. Reynolds therefore used on the Windsor order dies which had been made in connection with the Panaview order. Windsor did not thereafter order any doors from Panaview. It purchased from Reynolds the extrusion parts for approximately five thousand doors, at a cost of $155,624.97. Panaview claims that, if it had sold this many doors to Windsor, it would have made a profit of more than $150,000.00. Reynolds argues that the evidence of Panaview as to damages is speculative and that no damages were sustained.

During the period from December, 1954, through May, 1955, Reynolds was selling aluminum extrusions made with these dies to both Panaview and Windsor. While the trial court made no findings thereon, it is conceded that Panaview was receiving short and unbalanced deliveries from Reynolds during this period. There is evidence, however, that Reynolds' shipments to Panaview had always been short, delayed and unbalanced, and that shipments to Windsor were no more complete or timely. Reynolds also produced evidence countering the charge of Panaview that extrusions originally manufactured for Panaview were sometimes diverted to Windsor.

Reynolds has moved this Court for an order striking certain parts of the transcript of record.

The motion to strike from the record an exhibit attached to Panaview's trial court memorandum of points and authorities, consisting of a letter dated April 28, 1955, and to strike the reference in this memorandum to such letter, is granted. The letter in question was not received in evidence. The fact that the trial court denied, without prejudice, a similar motion, does not preclude us, proceeding under Rule 75(f), Federal Rules of Civil Procedure, 28 U.S.C.A., from correcting the record to exclude exhibits admittedly not received in evidence.

The motion to strike from the record a document, which had been marked plaintiff's exhibit 14 for identification, is also granted, and for the same reason. It is immaterial that it was the moving party, Reynolds, which designated this purported exhibit for incorporation in the record. Matters which were not before the trial court will be stricken on motion, even if they have been included in the record on appeal by stipulation. Heath v. Helmick, 9 Cir., 173 F.2d 156.

Proceeding now to the merits of the appeal, we consider, first, the cause of action based upon breach of contract. It is the contention of Panaview that Reynolds was contractually obliged to use the dies solely on orders submitted by Panaview. If this be true, then, as Reynolds readily concedes, the use of these dies in filling orders for Windsor constituted a breach of contract.

The trial court, however, found and concluded that Reynolds had no such contractual obligation.

The orders, together with the acknowledgments of them by Reynolds, comprise the contract between the parties. The acknowledgments are on a printed form drafted by Reynolds. On the back of this form are seventeen printed paragraphs of "Terms and Conditions." Included among these is Paragraph 11, which reads:

"Equipment: Any equipment (including jigs, printing plates or cylinders, dies and tools, etc.) which Sell-

er constructs or acquires specifically and solely for use on Buyer's order shall be and remain Seller's property and in Seller's sole possession and control. Any charges made by Seller therefor shall be for the use of such equipment only * * *."

Specifically, the language above quoted is a part of a printed form which appears on the reverse of an acknowledgment to Panaview of an order for Reynolds to make certain quantities of extrusions for the construction of the doors in question. Reynolds sent out a form of acknowledgment of this order, which had on its reverse side printed terms and conditions which included Paragraph 11, while on the face the extrusions ordered were listed and also an itemization of nine different extrusion dies. For these the document lists an itemized charge to Panaview designated as a "die charge" on the order. The amount of each "die charge" is entered in a column bearing the printed designation "Price." The total of the die charges is $1,430.00.

Paragraph 11, standing alone, does not evidence an agreement of the kind asserted by Panaview. It contains no words of promise. The purpose of the paragraph is not to specify what equipment shall be held for the sole use of the buyer. It provides only that, as to any equipment which Reynolds may have agreed to use "specifically and solely" on a buyer's order, Reynolds retains title, possession and control, despite the payment of a charge therefor.

But, of course, Paragraph 11 does not stand alone. In order to determine its full significance and to ascertain whether Reynolds, by these documents, did assume an obligation to hold the dies for the sole use of Panaview, we must examine the whole contract.[2]

There is no provision in any of the documents which specifies that Panaview obtained any rights as to the dies by paying the "die charge." The proper inference, from the language of the documents, is that such charges were made for the dies because of the use of them on the orders of Panaview for extrusions. There is no direct promise anywhere that these dies will not be used on the work of other customers. The entire balance of the documents contains no reference to printed Paragraph 11. None of these contains a promise by Reynolds that the specific dies for which the charge was made would be used specifically and solely upon orders of Panaview. Paragraph 11 itself deals only with the title of dies which Reynolds has made "specifically and solely for use on Buyer's order" and the disposition of such dies when the customer has furnished no further order for extrusions. But, in order to put this clause into effect, there must be a promise by Reynolds to make such exclusive use, which none of these documents contains. The contest here is not over the title to or disposition of the dies for which a charge was made to Panaview.

The cardinal point is that the documents as a whole contain no engagement or agreement that Reynolds will use any of these dies solely and exclusively on the work of Panaview. It is equally clear there was no such promise by Reynolds as to those for which a "die charge" was made. Paragraph 11 could not have been brought into play unless Panaview had insisted to a reference thereto on the face of the billing. In the instant case, the whole document, taken by the four corners, shows positively that there is no such promise. The face of the document specified only a "die charge" to Panaview. This term is not used in Paragraph 11 and is nowhere explained. But this lack of explanation gives no assistance in determining whether Reynolds promised to use all the dies so construct-

2. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." West's Ann. California Civil Code, § 1641. See, also, 1 Restatement of Contracts, § 235(c); City of Harlan, Iowa v. Duncan Parking Meter Corporation, 8 Cir., 231 F.2d 840, 841; Universal Sales Corporation v. California Press Manufacturing Co., 20 Cal.2d 751, 760, 128 P.2d 665, 671.

ed solely upon the order of Panaview. However, this circumstance does not render the document ambiguous. Reynolds did not say that Paragraph 11 of the printed form applied to this order. The document as a whole contains no provision from which such a promise can be inferred.

Thus, the documents so construed were not ambiguous. But it is said ambiguity arises from the conflicting claims and interpretations of employees of Reynolds as to the application of Paragraph 11. In general, it was the position of Reynolds at the trial that Paragraph 11 had no application to the dies in question. But in the affidavit of William O. Yates, Regional General Manager of Reynolds, which affidavit was received in evidence, it was said:

> "By written agreement with Panaview * * * the dies which we made were to remain the property of Reynolds Metals Company and under Reynolds Metals Company's sole possession and control, and Panaview simply acquired a priority on the use of the dies whenever its orders for extruded shapes were received by us * * *."

Since the only "written agreement" between Reynolds and Panaview, governing ownership, possession and control of the dies, is that which is to be found in Paragraph 11, it might appear that Yates then thought Paragraph 11 applied to the Panaview dies.

Reynolds argues that Yates made this statement in advancing the alternative argument of Reynolds that, if Paragraph 11 applies, Panaview obtained only a priority of use. It may be that Yates had such an alternative in mind. The concession that alternative interpretations of the contract are possible itself might tend to establish ambiguity.

A colloquy, which occurred during the course of the trial and which is quoted in the margin, shows that even counsel for Reynolds sometimes thought Paragraph 11 applied to the Panaview dies.[3] A still more graphic illustration of the confusion in Reynolds' camp as to the meaning of Paragraph 11 is found in this statement, made to the trial court by counsel for Reynolds:

> "Mr. Duque: If the court please, with regard to the interpretation of paragraph 11, paragraph 11 covers two situations, one where the dies are made solely for the use of the customer and another where it isn't solely for the use of the customer."

Panaview presents these various illustrations as "judicial admissions" on the part of Reynolds. However, we think the possibility of inconsistency between them and the general position of Reynolds, that Paragraph 11 has no application to the Panaview dies, deprives the quoted statements of standing as judicial admissions. But, upon the theory that these supply some extrinsic evidence that the contract was ambiguous with regard to the point here in issue, the circumstances surrounding the entry into the contract will be examined.

■ Where the language of a contract is ambiguous, the court must endeavor to find that meaning which represents the intent of the parties when the contract was executed. One permissible course in searching for such intent is to examine the circumstances under which the contract was made and the matters to which it relates. West's Ann. California Civil Code, § 1647.

There is considerable evidence of this kind in the record, which we now summarize. Abraham Grossman, President of Panaview, had his first experience in ordering aluminum extrusions from Reynolds in 1948. At that time, Grossman

3. "The Court: Well, as I understand the defendant's contention it is, under this paragraph 11, that notwithstanding the fact that the plaintiff paid for the dies, that it is nonetheless the property of the defendant. Mr. Mahoney (counsel for Panaview): That is correct, Your Honor. The Court: Is that a fair statement of the defendant's contention? Mr. Duque (counsel for Reynolds): Yes, it is, Your Honor."

was President of Glide Windows, Inc. The printed acknowledgment form then used by Reynolds differed in some respects from that which it later used in the Panaview contract. The equipment paragraph, designated 12 instead of 11, is quoted in the margin.[4]

It will be noted that the emphasized second sentence of Paragraph 12 expressly provides that all equipment which is made specifically for use on a buyer's order will be used exclusively for the manufacture of products for the buyer.

It is perfectly clear that, when Reynolds expected to be bound to exclusive use, its agents knew how to say so. It is equally obvious that, by leaving out the last sentence of this paragraph on the form which constituted the present contract, Reynolds intended to be bound to exclusive use only in instances where, by express language, such a promise was made to the customer. If such an express engagement were made on the face of the form, then Paragraph 11, as to title and disposition of the dies and other articles, would take effect. But, in the absence of a direct promise to use the dies exclusively for Panaview, Paragraph 11 had no effect whatsoever.

It is of stellar importance that Panaview and Grossman had contracted with Reynolds in the past, when the other form was in use. If it had been thought desirable, when this contract was entered, to require this sentence to be written on the face of the order, or another form of express promise, the responsibility rests upon Panaview or its agents. In viewing the surrounding circumstances, the omission is strong evidence that no such promise by Reynolds was contemplated by either party.

This is the most important piece of extrinsic evidence, but there are other circumstances which may have bearing which we now consider.

At the time the contract was made, Grossman and Panaview believed that Panador was about to be patented. If that had eventuated, there would have been no occasion for Reynolds to promise to use the dies solely for Panaview. Any other use would then have been an infringement of patent. When no patent issued, Panaview then discovered that a different contract should have been made.

The original pencil drawing submitted to Reynolds by Panaview bears the designation, "Horizontal sliding door designed by Abe Grossman—4-1-54." The shapes depicted in this drawing were designed solely by Grossman, and were for the parts of new, competitively-priced sliding doors unlike any then in use. The drawing carries the words "Patents Pending."

The extrusion department of Reynolds then made a drawing in which tolerances were added and other minor revisions were made. This drawing, which was submitted to Grossman for approval, carried the same notations as on the original pencil drawing. These were carried into the final invoices.

At the time these drawings were exchanged and the contract between these parties came into being, Reynolds had no customer other than Panaview for these Panador aluminum extrusions. Nor did it then have any prospective customers. As a matter of fact, it must then have seemed quite unlikely that Reynolds would ever have any other customers for such extrusions, in view of the notice it then had that a patent application was pending. The failure of Panaview to ask for an exclusive use clause in the contract is thus explained. It was not until September, 1954, several months after this contract was entered into, that,

4. "12. Equipment: Any equipment (including jigs, printing plates or cylinders, dies and tools, but excluding patterns) which Seller constructs or acquires specifically for use on Buyer's order shall be and remain Seller's property and in Seller's sole possession and control, and any charges made by Seller therefor shall be for the use of such equipment only. *All such equipment will be used exclusively for the manufacture of products for Buyer * * *.*" (Emphasis added.)

Windsor came to Reynolds with a Panador and ordered similar extrusions.

It was also adduced at the trial that the "die charge" was less than half the actual cost of making the die, that no sales tax was paid by Panaview on the die charges and, significantly, that Reynolds actually manufactured more than one set of dies upon which no "die charge" was levied against Panaview.

■■ We have now set out all the evidence relating to the circumstances from which inferences might be drawn as to the intent of the parties, as though the contract were ambiguous.[5] It was not ambiguous, as we have held. Since this evidence was in the record, the trial judge made express findings of fact. One of these directly found that Panaview had not proved that the dies in controversy were constructed "solely for use on buyer's order" within the meaning of Paragraph 11. He also found that Reynolds did not at any time agree to keep such dies for the sole and exclusive use of Panaview and that the "die charge" was a service fee for the use of the dies in manufacturing the extrusions. With these findings we agree.

It is claimed these were not findings, but mere conclusions. The testimony covers about three hundred printed pages. The credibility of the witnesses enter into the weight thereof. If the trial judge had determined at the outset that the writings were plain, the trial could have ended there. But there was a trial relating to all the extrinsic circumstances, and the findings of fact were made as a result.

It has been suggested that, from the undisputed evidence found in this record, this Court should now find that the circumstances surrounding the inception of the contract are such that the only possible inference therefrom is that Reynolds promised to use these dies for Panaview alone. If such a rule has any validity, it should be confined to *facts* established by judicial admission or by stipulation. The mere circumstance that a witness has testified to a fact and the testimony is not controverted does not enshrine it as an undisputed fact.

■ The trial court here has made findings of fact. If we should hold these findings "clearly erroneous" or hold that on the entire record it is clear a mistake has been made, we could, of course, reverse. If this Court should hold that the writings are ambiguous and that the trial judge failed to make appropriate findings as to the circumstances surrounding the making of the contract, it would be our function to remand. The Federal Rules of Civil Procedure give this Court no power to make new independent findings upon evidence which this Court did not hear. Trial de novo is not permitted under our present system, except perhaps in admiralty.

We affirm the trial court on the ground that the writings were not ambiguous and contained no promise to use any of the dies, made after Panaview gave the order, specifically and solely for use on work of the latter. We likewise approve the findings of the trial judge that the collateral circumstances at the inception of the contract call for no inference that such a promise was made or intended. We likewise hold that the findings of the trial court, that there never at any time existed a fiduciary or trust relationship between the parties, that there was never any disclosure by defendant of any confidential information furnished to it by plaintiff, that there was no damage and that the allegations of unfair competition had not been proved, were supported by the evidence and were not clearly erroneous.

The judgment is affirmed.

5. If it were ambiguous, the findings of the trial court would be upheld for " 'the construction of an uncertain or ambiguous agreement by the trial court after the taking of oral evidence in aid of its interpretation must stand unless it is without support in the evidence.' " Pacific Portland Cement Co. v. Food Machinery & Chemical Corporation, 9 Cir., 178 F.2d 541, 553; Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.