FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PATRICK RUSSELL, individually, and as Personal Representative of the Estate of Patrick John Russell; LYNNE RUSSELL, individually, and as Personal Representative of the Estate of Patrick John Russell, *Plaintiffs-Appellees*, <br><br> v. <br><br> JOCELYN LUMITAP, individually; PATTI TROUT, individually; MARIA TEOFILO, individually; THOMAS LE, individually, *Defendants-Appellants*. | No. 18-55831 <br><br> D.C. No. 8:17-cv-00125-JLS-DFM <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Josephine L. Staton, District Judge, Presiding

Argued and Submitted October 23, 2019
Submission Withdrawn August 19, 2020
Resubmitted April 6, 2022[*]
Pasadena, California

Filed April 13, 2022

Before:  Andrew J. Kleinfeld, Consuelo M. Callahan, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge Kleinfeld

---

## SUMMARY[**]

---

### Prisoner Civil Rights

The panel affirmed in part and reversed in part the district court's denial, on summary judgment, of qualified immunity to medical providers at Orange County Jail in an action brought pursuant to 42 U.S.C. § 1983 alleging that defendants

---

[*] While this panel was considering this case, another panel with priority issued its decision in *Sandoval v. Cnty. of San Diego*, 985 F.3d 657 (9th Cir. 2021).  The Supreme Court denied certiorari in *Sandoval* on December 13, 2021, and we decided *Hyde v. City of Willcox*, 23 F.4th 863 (9th Cir. 2022), also relevant to this case, on January 6, 2022.  Counsel were ordered to brief the effects of those two cases on this one on January 25, 2022, and the briefs were filed on February 24 and 25, 2022.  We accordingly revised our opinion as necessary and resubmitted this case on April 6, 2022.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

were deliberately indifferent to the medical needs of Patrick John Russell, a pretrial detainee who died from a ruptured aortic dissection.

The panel first held that it had jurisdiction to review the denial of qualified immunity at the summary judgment stage because defendants did not challenge the determination that there were genuine issues over material facts, but instead argued that they were entitled to qualified immunity because they did not violate Russell's clearly established constitutional rights on the record taken in the light most favorable to Russell.

Applying *Sandoval v. County of San Diego,* 985 F.3d 657 (9th Cir. 2021), the panel stated that to defeat qualified immunity plaintiffs must show that, given the available case law at the time, a reasonable official, knowing what Dr. Le, Nurse Teofilo, Nurse Trout, and Nurse Lumitap knew, would have understood that their actions presented such a substantial risk of harm to Russell that the failure to act was unconstitutional. Their actual subjective appreciation of the risk was not an element of the established-law inquiry.

The panel held that under the circumstances, taking the facts most favorably to the plaintiffs, Dr. Le, the on-call physician at the time, could not have reasonably believed based on the clearly established law as it stood then that he could provide constitutionally adequate care without even examining a patient with Russell's symptoms who had not responded to a dose of nitroglycerin. Therefore, the district court was correct in denying summary judgment on qualified immunity to Dr. Le.

The panel held that Nurse Teofilo had access to facts from which an inference could be drawn that Russell was at serious risk. Yet she did not call the paramedics, nor did she call Dr. Le to ask whether Russell's worsening symptoms required anything more than the Motrin that had previously been prescribed. The district court was correct in denying summary judgment on qualified immunity to Nurse Teofilo. A reasonable jury could conclude that she met the standard for deliberate indifference.

The panel held that Nurse Trout was entitled to summary judgment on qualified immunity. A jury could not, on the facts pleaded, reasonably conclude that Nurse Trout was deliberately indifferent. Though perhaps she should have called the paramedics, her having promptly called the physician on call and followed his instructions could not be categorized as deliberate indifference.

The panel held that Nurse Lumitap was not entitled to qualified immunity. Drawing all inferences in plaintiff's favor, a reasonable person in Nurse Lumitap's position would have inferred that Russell was at serious risk if not hospitalized.

## COUNSEL

S. Frank Harrell (argued), Lynberg & Watkins APC, Orange, California, for Defendants-Appellants.

Dale K. Galipo (argued) and Marcel F. Sincich, Law Offices of Dale K. Galipo, Woodland Hills, California; Cameron Sehat, The Sehat Law Firm PLC, Irvine, California; for Plaintiffs-Appellees.

## OPINION

KLEINFELD, Circuit Judge:

## I. Factual Background

On January 8, 2016, Patrick John Russell was arrested for a probation violation and booked at the Orange County Jail.[1] During an initial medical screening, he indicated that he did not have any of the listed chronic conditions or any other medical conditions that he wished to disclose.

At around 10:35 p.m. on January 23, 2016, Russell was seen by Nurse Maria Teofilo. He was hyperventilating, vomiting, and dry heaving. He told her that he could not breathe and that he was having an anxiety attack. Nurse Teofilo gave him Pepto Bismol (or its generic equivalent, bismuth subsalicylate), but did not notify the doctor on duty or summon paramedics.

Later that night, at 12:03 a.m. on January 24, 2016, Russell returned to Nurse Teofilo, now complaining of chest pain. Russell told her that he believed the pain was muscular because he had done thirty push-ups the day before. But he also told her that he was nervous, anxious, and unable to calm down. He was in distress and unable to express his needs clearly. Nurse Teofilo advised him on stretching and referred him to the Intake Release Center for a mental-health screening.

---

[1] As explained below, at this stage we evaluate the record in the light most favorable to the plaintiff. *Nicholson v. City of Los Angeles*, 935 F.3d 685, 690 (9th Cir. 2019). Therefore, where any facts are disputed, we accept the version most favorable to Russell.

At around 1:08 a.m., Russell arrived by bus at the Intake Release Center and was seen there by Nurse Patti Trout. He complained to her of continued chest pain, pointing to the center of his chest and lower portion of his throat, and told her that the pain was now radiating to his arm and jaw. He was short of breath and his hands and feet were numb. He also told her that he had vomited on the bus on the way there. In response, Nurse Trout gave him a dose of nitroglycerin.

Despite the nitroglycerin, Russell's severe chest pain persisted—five minutes after the dose, Russell told Nurse Trout that the severity of his chest pain was now between 8 and 9 out of 10. He was anxiously wringing his hands and breathing rapidly, and he vomited again. Nurse Trout consulted with the on-call physician, Dr. Thomas Le, over the phone, relaying Russell's symptoms and informing him that a dose of nitroglycerin had been ineffective.[2] According to

---

[2] There is some inconsistency as to what information Dr. Le was given when Nurse Trout called. In her contemporaneous notes, Nurse Trout stated, "5 MIN AFTER NTG WAS GIVEN, IM STATES PAIN IN CHEST IS BETWEEN 8 AND 9, IM THEN VOMITED INTO TRASH CAN, WATERY, CLEAR. HR ELEVATED TO 88. POX 100%. SKIN W/D. COLOR PINK. APPEARS ANXIOUS, WRINGING HANDS AND BREATHING RAPIDLY. RR 26." Directly below this description, she noted that she "NOTIFIED DR. LE OF ABOVE." In Nurse Trout's declaration made on January 3, 2018, she stated that she "reported to Dr. Le all of the symptoms Russell had been experiencing (complaints of anxiety and muscle pain from doing push-ups), Russell's (stable) vital signs, and that Russell told [her] his pain increased when I applied manual pressure to his chest and when he took deep breaths." In Dr. Le's declaration, also made on January 3, 2018, he stated that "Nurse [T]rout reported to [him] all of the symptoms Russell had been experiencing (complaints of anxiety and muscle pain from doing sit-ups), Russell's (stable) vital signs, and that Russell told Nurse Trout that his pain increased when she applied manual pressure to his chest and when he took deep breaths." To the extent that Nurse Trout and Dr. Le's

Orange County Correctional Health Services' Standardized Procedures for Registered Nurses that were in place at the time, the appropriate treatment for acute angina pectoris—defined as pressure in the chest or precordial discomfort—is to begin administering nitroglycerin and to then call for paramedics if symptoms "do not subside after the *first* dose." This is also the first step in the Standardized Procedures for treating cardiac arrest.

Nevertheless, although Nurse Trout had considered calling paramedics, Dr. Le ordered that Russell be administered Motrin (*i.e.*, ibuprofen, a nonsteroidal anti-inflammatory drug) and be referred for a mental health evaluation. Though Dr. Le was only a fifteen-minute drive away, he never physically examined Russell at any time.

At around 1:30 a.m., pursuant to Dr. Le's orders, Russell received a mental-health screening from a non-party nurse. He told the nurse that he was anxious about his potential prison sentence, that he had never had prior mental health problems, and that he had a history of daily THC use and alcohol abuse. The nurse instructed him on breathing and relaxation exercises and told him how to contact mental health for further assistance if necessary.

At around 2:04 a.m., Russell returned to the medical ward complaining to Nurse Teofilo of "flu-like" symptoms. She

---

declarations—by not referencing any dose of nitroglycerin—conflict with Nurse Trout's contemporaneous notes, we are required at this stage to resolve that factual dispute in favor of Russell. *Nicholson*, 935 F.3d at 690. Therefore, we assume for purposes of this decision that Nurse Trout informed Dr. Le that she had administered a dose of nitroglycerin to Russell and that this dose did not relieve Russell's pain.

instructed Russell on how to communicate his symptoms to medical staff and told him to return if necessary.

Around 5:32 a.m., Russell returned to the medical ward complaining of severe chest pain. The severity of his pain was now a 10 out of 10, and he was hyperventilating. The First Amended Complaint states that at this point he was tachycardic (had a rapid heartbeat). Russell told Nurse Teofilo that he had been administered a dose of nitroglycerin but it had not alleviated his pain. Nurse Teofilo knew that, "per policy," a patient who has not responded to a dose of nitroglycerin must be hospitalized. She therefore called Nurse Trout to ask why Russell had not been hospitalized in accordance with the Standardized Procedures. Nurse Trout told her that Dr. Le had simply recommended Motrin and a mental health screening. Nurse Teofilo considered whether she should hospitalize Russell, but ultimately decided not to send for paramedics after speaking with Nurse Trout. Nurse Teofilo administered a dose of Motrin and Russell remained in the dispensary for observation.

Around 7:00 a.m., Russell complained of continued chest pain to Nurse Jocelyn Lumitap. He was now displaying signs of physical distress. He was sitting hunched over with his head down and supporting his chest with his hand. He was worried about his pain and wanted to see the doctor. Instead, Lumitap instructed Russell on relaxation techniques, gave him an analgesic heat balm for his chest pain, and told him he would be checked again after lunch.

At 10:43 a.m., Nurse Lumitap consulted with a non-party nurse. This non-party nurse advised her to keep on the same

course of treatment with Russell.**[3]**   She reassured Nurse Lumitap that Russell would be okay.   Nurse Lumitap speculated that the basis for this reassurance was Russell's vital signs and the fact that Dr. Le had already given his recommendation over six hours earlier.

Around 11:08 a.m., Russell returned to the medical ward complaining to Nurse Lumitap of deep throbbing pain in the middle of his chest and throat, with his pain still at a 10 out of 10.  He denied having a heart condition, but said he had been told he had high blood pressure.  He had "flu-like" symptoms, was hyperventilating, and bent over when he walked.  Russell vomited in front of Nurse Lumitap, and stated that he felt a bit better but that his chest was still in pain.  He sat on the floor for a few minutes next to a trash bin and then managed to sit on the chair.  He remained in the ward resting on a patient table.  After a brief rest, Russell sat up around 11:40 a.m. to vomit.  He lay down on the floor at first, but then was able to get back up onto the table.

Finally, at around 12:20 p.m., Nurse Lumitap saw Russell breathing hard and sitting in an unresponsive state.  Russell was suffering from "agonal"**[4]** breathing, his eyes were crossed, his skin was pale, he was drooling and sweating profusely, and he was tachycardic.  At this point, Nurse

---

**[3]** Nurse Lumitap posted the progress note describing her 10:43 a.m. discussion with another nurse at 3:39 p.m., hours after Russell had died. It is the last substantive progress note in his chart, and the only progress note marked as a "LATE ENTRY."

**[4]** "Agonal" means "Pertaining to the period immediately preceding death; usually a matter of minutes but occasionally indicating a period of several hours." *Agonal*, *Blakiston's Gould Medical Dictionary* (3d ed. 1972).

Lumitap called paramedics and helped begin CPR, administer oxygen, and initiate the Automated External Defibrillator. Paramedics arrived around 12:28 p.m. and Russell was transferred to a hospital where he soon died. An autopsy revealed that he died of hemothorax and hemopericardium, which means that there was a collection of blood between his chest wall and his lungs, as well as in the membrane surrounding his heart. According to the autopsy, these injuries were caused by an aortic dissection, *i.e.*, a rupture in a part of Russel's aorta, the artery that carries blood from the heart to the rest of the body.

Russell's parents sued Dr. Le, Nurse Teofilo, Nurse Trout, and Nurse Lumitap ("the Medical Team") on behalf of Russell's estate and individually for (among other things) violating his constitutional rights under § 1983 on a theory of deliberate indifference to his serious medical needs. The district court below denied the Medical Team's motion for summary judgment on qualified immunity and the Medical Team filed this interlocutory appeal on that issue.

Obviously, on this record as read most favorably to him, Russell received poor medical care. Dr. Le should have driven over to see him. The nurses should have made repeated phone calls to Dr. Le as Russell's symptoms worsened. Russell should have been sent to the hospital. Had all this been done, on this record, he might have lived. But this is not a medical malpractice case. In a § 1983 case, we must determine whether the level of medical care was unconstitutional, not whether it was so substandard that it may have cost Russell his life.

## II. The scope of our review

We have jurisdiction to review the denial of qualified immunity at the summary judgment stage under 21 U.S.C. § 1291,[5] and we do so de novo.[6] However, the scope of review over such an interlocutory appeal is "circumscribed" because the Court may not "consider eviden[tiary] sufficiency, i.e., which facts a party may, or may not, be able to prove at trial."[7] Therefore, the relevant question is "whether the defendant[s] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor."[8]

---

[5] *Nicholson*, 935 F.3d at 690.

[6] *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017). We also **GRANT** the Medical Team's motion to strike the Supplemental Excerpts of Record except for page 64 and the corresponding portions of Russell's Answering Brief. The district court declined to receive the challenged documents because the matter had already been briefed, argued, and submitted for decision, and because the statements by Russell's medical experts did not amount to new evidence. They were not before the district court when it issued its order denying qualified immunity to the Medical Team and we therefore do not consider them here. *Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077–78 (9th Cir. 1988); *Panaview Door & Window Co. v. Reynolds Metal Co.*, 255 F.2d 920, 922 (9th Cir. 1958).

[7] *Nicholson*, 935 F.3d at 690 (alteration in original) (internal quotation marks omitted) (quoting *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013)).

[8] *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Morris*, 736 F.3d at 836).

Russell argues that this Court lacks jurisdiction over the Medical Team's appeal because the district court's denial of summary judgment was based on a determination that the evidence had "two susceptible interpretations, thus it is for a jury to decide whether Appellants acted with deliberate indifference." But in the context of this interlocutory appeal, the Supreme Court has distinguished between "an appealed order's reviewable determination (that a given set of facts violates clearly established law) from its unreviewable determination (that an issue of fact is 'genuine')."[9] Here, the Medical Team does not challenge the determination that there are genuine disputes over material facts, but instead argues that they are nevertheless entitled to qualified immunity because they did not violate Russell's clearly established constitutional rights on the record taken in the light most favorable to Russell. We do have jurisdiction to decide an "abstract issue of law,"[10] such as whether—assuming all factual disputes resolved and all reasonable inferences drawn in a plaintiff's favor[11]—the defendants are entitled to qualified immunity. Therefore, we have jurisdiction to decide this appeal.[12]

## III.  Discussion

Under 42 U.S.C. § 1983, a private right of action exists against anyone who, "under color of" state law, causes a

---

[9] *Johnson v. Jones*, 515 U.S. 304, 319 (1995).

[10] *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996).

[11] *Nicholson*, 935 F.3d at 690.

[12] *Pauluk v. Savage*, 836 F.3d 1117, 1121 (9th Cir. 2016).

person to be subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ."  However, state officers are entitled to qualified immunity from a § 1983 suit unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"**[13]**

"[T]he qualified immunity inquiry is separate from the constitutional inquiry, and courts must undertake the qualified immunity analysis separately."**[14]**  We review de novo,**[15]** so we undertake the qualified immunity inquiry below.

## A.  Defining "clearly established" law

The Supreme Court has admonished us "not to define clearly established law at a high level of generality."**[16]**  While there need not exist "a case directly on point for a right to be clearly established, existing precedent must have placed the . . . constitutional question beyond debate."**[17]**  "The precedent

---

[13] *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

[14] *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1053 (9th Cir. 2002).

[15] *Roybal*, 871 F.3d at 931.

[16] *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted) (quoting *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)).

[17] *Id.* (internal quotation marks omitted) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

must be "'controlling'—from the Ninth Circuit or the Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction."[18] However, cases decided after the alleged constitutional violation cannot create clearly established law for purposes of this prong because reasonable officers are "not required to foresee judicial decisions that do not yet exist in instances where the [constitutional] requirements . . . are far from obvious."[19]

"That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."[20] It is not necessary to have a case involving a heart attack, a case involving appendicitis, or a case involving a bowel obstruction for a § 1983 claim based on one of those conditions to survive qualified immunity. Instead, a "clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[21] "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers."[22] "[T]here can be the rare obvious case, where the unlawfulness of the

---

[18] *Martinez v. City of Clovis*, 943 F.3d 1260, 1275 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Sharp v. Cnty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017)).

[19] *Kisela*, 138 S. Ct. at 1154.

[20] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[21] *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 599 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017)).

[22] *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted) (quoting *White*, 137 S. Ct. at 552).

officer's conduct is sufficiently clear even though existing precedent does not address similar concerns."[23]

## B. The government's obligation to provide pretrial detainees with adequate medical care

In 1976, the Supreme Court first recognized "the government's obligation to provide medical care for those whom it is punishing by incarceration."[24]  On that reasoning, it held that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's prohibition on cruel and unusual punishment.[25]  We concluded that the same standard should also apply to such claims brought by pretrial detainees, because even though those claims "arise under the due process clause [of the Fourteenth Amendment], the eighth amendment guarantees provide *a minimum standard of care* for determining [a prisoner's] rights as a pretrial detainee, including [the prisoner's] rights . . . to medical care."[26]  At the time of Russell's death, our decision in *Clouthier v. County of Contra Costa*[27] provided the standard according to which "all conditions of confinement claims,

---

[23] *City of Escondido v. Emmons*, 139 S. Ct. 500, 504 (2019) (quoting *Wesby*, 138 S. Ct. at 590).

[24] *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

[25] *Id.* at 104.

[26] *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996) (emphasis and alterations in original) (internal quotation marks omitted) (quoting *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986)).

[27] 591 F.3d 1232 (9th Cir. 2010), *overruled by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

including claims for inadequate medical care, were analyzed
. . . ."[28]  Under *Clouthier*, the deliberate-indifference analysis
turned on two separate issues: "(1) whether [the plaintiff] was
confined under conditions posing a 'substantial risk of serious
harm' and (2) whether the officers were deliberately
indifferent to that risk."[29]

However, the standard governing claims for inadequate
medical care has changed since Russell's death.  After our
decision in *Clouthier*, the Supreme Court cautioned in
*Kingsley v. Hendrickson*[30] that claims brought by pretrial
detainees under the Fourteenth Amendment should not
necessarily be evaluated under the same standard as claims
brought by convicted prisoners under the Eighth
Amendment.[31]  *Kingsley* addressed a claim brought by a
pretrial detainee that jail officers had used excessive force
against him.[32]  The Court held that a defendant bringing such
a claim need not show subjective deliberate indifference; he
need only demonstrate "that the force purposely or knowingly
used against him was objectively unreasonable."[33]

---

[28] *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018).

[29] 591 F.3d at 1244 (quoting *Lolli v. Cnty. of Orange*, 351 F.3d 410, 420 (9th Cir. 2003)).

[30] 576 U.S. 389 (2015).

[31] *Id.* at 400–01.

[32] *Id.* at 391.

[33] *Id.* at 397.

In *Gordon v. County of Orange*, we extended the Supreme Court's reasoning in *Kingsley* to claims for inadequate medical care brought by pretrial detainees.[34] Under *Gordon*, a pretrial detainee who brings an inadequate medical care claim must show that:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;

> (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

> (iv) by not taking such measures, the defendant caused the plaintiff's injuries.[35]

Thus the subjective second prong of *Clouthier* has been replaced by an objective standard: A defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference. Under this objective reasonableness standard,

---

[34] 888 F.3d 1118, 1124–25 (9th Cir. 2018).

[35] *Id.* at 1125.

a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard."**[36]**

## C.  Substantial risk of serious harm

*Gordon* did not revise the "substantial risk of serious harm" prong from *Clouthier*, and the law at the time of Russell's death clearly established that Russell's conditions put him at a substantial risk of serious harm.  In the inadequate-medical-care context, the "substantial risk of serious harm" prong was met if there was a "serious medical need," such that a "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."**[37]**  This is an objective standard, and includes the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."**[38]**

As the district court noted, Russell's aortic dissection was indeed a "serious" medical need, as it resulted in his death. The Medical Team argues that, for this prong of the inadequate medical care test, we should only consider the

---

**[36]** *Id.* (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

**[37]** *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) (en banc) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

**[38]** *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (internal quotation marks omitted) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled in part on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc)).

symptoms Russell was experiencing before he died rather than asking whether an aortic dissection itself constitutes a serious medical need. Even assuming we limited the scope of this test in this manner, Russell's symptoms—including hyperventilation, vomiting, dry heaving, difficulty breathing, severe chest pain radiating to his arm and jaw, numbness in his hands and feet, and tachycardia—are medical issues "that a reasonable doctor or patient would find important and worthy of comment or treatment . . . ."[39] This prong was therefore satisfied.

## D. Objective indifference

The primary issue in this case is the third prong of the *Gordon* test. As we explained, the subjective deliberate indifference prong of the *Clouthier* test that governed inadequate medical care claims at the time of Russell's death has since been replaced by *Gordon*'s objective prong. An officer is entitled to qualified immunity unless the unlawfulness of his conduct was clearly established at the time that he acted,[40] and the law at the time that the defendants acted was different than it is now. However, we held in *Sandoval v. County of San Diego* that "when we assess qualified immunity for a claim of inadequate medical care of a pre-trial detainee arising out of an incident that took place prior to *Gordon*, we . . . 'concentrate on the objective aspects of the [pre-*Gordon*] constitutional standard' to

---

[39] *Colwell*, 763 F.3d at 1066 (internal quotation marks omitted) (quoting *McGuckin*, 974 F.2d at 1059–60, *overruled in part on other grounds by WMX Techs.*, 104 F.3d at 1136).

[40] *Wesby*, 138 S. Ct. at 589 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

evaluate whether the law was clearly established."[41]  "[T]he objective deliberate indifference standard applies even when the incident occurred pre-*Gordon*."[42]  Thus, to determine whether the defendants are entitled to qualified immunity, we do not consider whether they subjectively understood that Russell faced a substantial risk of serious harm.[43]  Rather, we conduct "an objective examination of whether established case law would make clear to every reasonable official that the defendant's *conduct* was unlawful in the situation he confronted."[44]

Applying *Sandoval*'s approach here, to defeat qualified immunity the plaintiffs must show that, given the available case law at the time, a reasonable official, knowing what Dr. Le, Nurse Teofilo, Nurse Trout, and Nurse Lumitap knew, would have understood that their actions "presented such a substantial risk of harm to [Russell] that the failure to act was unconstitutional."[45]  Their "actual subjective appreciation of the risk is not an element of the established-law inquiry."[46]

---

[41] 985 F.3d 657, 672 (9th Cir. 2021).

[42] *Id.* at 674.

[43] *See id.* at 676–78.

[44] *Id.* at 678 (citing *Horton*, 915 F.3d at 600–02) (emphasis in original).

[45] *Id.* (quoting *Horton*, 915 F.3d at 600).

[46] *Id.*  We do not suggest that the outcome in this case turns on the "objective" test, nor do we exclude the possibility that the old "subjective" standard would lead to a different outcome.

To show that an official's failure to act was unconstitutional, a plaintiff need not "prove complete failure to treat" because "access to medical staff is meaningless unless that staff is competent and can render competent care."[47]  And there is no reason to doubt that, although medical negligence is not by itself unconstitutional, the care rendered can be so inadequate to the circumstances known to the medical staff as to amount to deliberate indifference.  By the time of Russell's death, we had reversed a grant of summary judgment in favor of three nurses and a doctor who failed to adequately care for a pretrial detainee who had suffered a head injury.[48]  Instead of calling the emergency room when the detainee began to exhibit symptoms of serious complications from a head injury, the doctor prescribed sedatives which masked the symptoms of the complications.[49] Even though they did provide treatment, the record permitted the inference that the treatment they provided was constitutionally defective, and summary judgment in their favor was therefore inappropriate.[50]

We have recognized that "failing to provide CPR or other life-saving measures to an inmate in obvious need can

---

[47] *Ortiz v. Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (internal quotation marks omitted) (quoting *Cabrales v. Cnty. of Los Angeles*, 864 F.2d 1454, 1461 (9th Cir. 1988)).

[48] *See id.* at 1313–14.

[49] *See id.*

[50] *See id.* at 1314.

provide the basis for liability under § 1983."[51]  For example, we have found that officers were not entitled to summary judgment on liability where they discovered an inmate unconscious after a suicide attempt and failed to administer CPR "despite an obvious need."[52]  And we have found that nurses were not entitled to summary judgment on qualified immunity where they failed to call paramedics to assist an inmate who was unresponsive and having a seizure, because it was clearly established that "every reasonable nurse" would have understood that paramedics were necessary in such a situation.[53]

While we need not point to cases dealing with the specific type of cardiac symptoms Russell displayed, aortic dissection, it is worth noting that by the time of Russell's death, some of our sister Circuits had dealt with the law as applied to such a situation.  The Eighth Circuit, for example, held that the deliberate indifference standard was satisfied by a delay in treatment for an inmate with a history of heart problems who displayed "classic heart attack symptoms" that were "obviously severe," including arm and chest pains, profuse sweating, and nausea.[54]  In another decision, the Eighth Circuit had also concluded that the standard was met where prison officials began CPR in response to an inmate's heart attack but then halted treatment for up to ten minutes "with

---

[51] *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013).

[52] *Id.* at 1083.

[53] *Sandoval*, 985 F.3d at 679.

[54] *Plemmons v. Roberts*, 439 F.3d 818, 823–25 (8th Cir. 2006).

no good or apparent explanation for the delay . . . ."[55] Similarly, the Sixth Circuit held that the deliberate indifference standard was met where an official delayed transportation to a hospital for a detainee who had not taken what an officer believed was her heart medication for three days and who was displaying "classic" signs of an impending heart attack such as chest pain and difficulty breathing.[56]

## 1.  Dr.  Le

After Nurse Trout administered a dose of nitroglycerin to Russell and it failed to alleviate his symptoms, she called Dr. Le, the on-call physician at the time.  According to Nurse Trout's notes in Russell's medical record, she told Dr. Le that she had administered a dose of nitroglycerin but that Russell was still experiencing chest pain, vomiting, and rapid breathing, and that he appeared anxious.

In response to Nurse Trout's report of Russell's symptoms, Dr. Le merely recommended Motrin and a mental-health screening over the phone.  He did not recommend hospitalization after learning that the first dose of nitroglycerin had been ineffective, nor did he ever physically examine Russell, even though he lived only fifteen minutes away.  Dr. Le did not give any specific explanation for why he chose to diagnose Russell over the phone rather than in person, simply stating that "[w]e do that all the time" and "[t]hat's the standard of care nowadays."

---

[55] *Tlamka v. Serrell*, 244 F.3d 628, 632–35 (8th Cir. 2001).

[56] *Estate of Carter v. Detroit*, 408 F.3d 305, 312–13 (6th Cir. 2005).

While of course there is no § 1983 liability for simply acting contrary to prison policy,[57] the Correctional Health Services Standardized Procedures for Registered Nurses help to underscore that Dr. Le, and the other members of the medical team, had access to facts from which a reasonable person would infer that Russell was at serious medical risk. Nurse Trout administered nitroglycerin to Russell around 1:08 a.m. on January 24, but Russell's chest pain did not subside. According to the Standardized Procedures, a nurse who administers nitroglycerin for chest pain must call for paramedics if symptoms "do not subside after the *first* dose." The record does not explain why the procedure demands such an urgent response to an ineffective dose of nitroglycerin. But drawing all reasonable inferences in favor of Russell—as we must at this stage—we are compelled to infer that a patient whose chest pain does not subside after one dose of nitroglycerin is known to the prison system to be at a substantial risk of harm. Therefore, each medical professional who knew that Russell had been administered an ineffective dose of nitroglycerin had facts available from which a reasonable person would infer that he was at substantial risk of harm if not hospitalized. And he steadily grew worse instead of better. As the night went on, by 5:32 a.m., Russell was obviously much sicker than at 1:08 a.m. and obviously in a life-threatening medical condition.

Like the plaintiffs in *Plemmons*, *Tlamka*, and *Estate of Carter*, Russell was displaying "classic" and "obviously

---

[57] *Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 929–30 (9th Cir. 2001).

severe"[58] symptoms of a heart attack. And like the officials in *Tlamka*, Dr. Le and the nurses halted treatment "with no good or apparent explanation for the delay . . . ."[59] Dr. Le knew that the intervention plan under the Standardized Procedures for angina pectoris had been initiated when Russell was given a first dose of nitroglycerin, yet he did not recommend continuing this line of treatment—which called for the administration of up to two more doses of nitroglycerin within as little as five minutes after the first dose, and hospitalization.

As in *Clouthier*, it should have been clear to Dr. Le that Russell was at severe risk based on Nurse Trout's call relaying his symptoms and the recommendation of the Standardized Procedures to hospitalize Russell under these circumstances.[60] Unlike *Simmons*, it is reasonable to infer—and so, again, at this stage we must[61]—that a reasonable person in Dr. Le's position would have been aware that the risk to Russell was "*imminent*"[62] due to the severity and

---

[58] *Tlamka*, 244 F.3d at 632–35; *Estate of Carter*, 408 F.3d at 312–13; *Plemmons*, 439 F.3d at 823–25.

[59] *Tlamka*, 244 F.3d at 635.

[60] *Clouthier*, 591 F.3d at 1244.

[61] *Nicholson*, 935 F.3d at 690.

[62] *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1018 (9th Cir. 2010) (internal quotation marks omitted) (emphasis in original) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 990 (9th Cir. 1998)), *overruled in part by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc).

nature of the symptoms and the "obvious"[63] nature of the risk, as demonstrated in part by the fact that the Standardized Procedures called for an immediate call to paramedics under these circumstances.

Nevertheless, without explanation or examination, Dr. Le did not recommend that Nurse Trout conform her treatment to the Standardized Procedures. As in *Ortiz*, Dr. Le made his recommendation without examining his patient despite his knowledge of Russell's ominous symptoms, and disregarded a clear signal—the ineffectiveness of the dose of nitroglycerin—that Russell's condition was potentially fatal.[64] While Dr. Le recommended Motrin and a mental-health screening, clearly established law at the time provided that Russell need not "prove complete failure to treat" because "access to medical staff is meaningless unless that staff is competent and can render competent care."[65] A reasonable jury could conclude that Dr. Le had been deliberately indifferent.

Under these circumstances, taking the facts most favorably to the plaintiffs, Dr. Le could not have reasonably believed based on the clearly established law as it stood then that he could provide constitutionally adequate care without even examining a patient with Russell's symptoms who had not responded to a dose of nitroglycerin. Therefore, the

---

[63] *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

[64] *Ortiz*, 884 F.2d at 1313–14.

[65] *Id.* at 1314 (9th Cir. 1989) (quoting *Cabrales*, 864 F.2d at 1461) (internal quotation marks omitted).

district court was correct in denying summary judgment on qualified immunity to Dr. Le.

## 2. Nurse Teofilo

Nurse Teofilo interacted with Russell four times between around 10:35 p.m. on January 23 and around 5:32 a.m. on January 24. During Russell's first visit with Nurse Teofilo at 10:35 p.m., he told her that he was having an anxiety attack and could not breathe, and she gave him Pepto Bismol. He returned to her a few hours later, at around 12:03 a.m., and told her he believed the pain was muscular because he had done thirty push-ups the day before. Nurse Trout gave Russell a dose of nitroglycerin at around 1:08 a.m., and Nurse Teofilo saw him twice after that: he complained to her of flu-like symptoms at around 2:04 a.m., and he returned once more with chest pain at around 5:32 a.m., at which point she administered a dose of Motrin. During these interactions, Russell showed worsening symptoms including hyperventilation, vomiting, dry heaving, severe chest pain, anxiety, an inability to express his needs clearly, flu-like symptoms, labored breathing, and tachycardia.

As described above, each member of the Medical Team, including Nurse Teofilo, had access to facts from which an inference could be drawn that Russell was at serious risk. There is also evidence that Nurse Teofilo actually drew that inference—when Russell complained to her of flu-like symptoms at around 2:04 a.m., she reached out to Nurse Trout to ask why Russell had not been hospitalized in accordance with policy after he failed to respond to nitroglycerine. Nurse Teofilo learned from Nurse Trout that Dr. Le had only recommended Motrin and a mental health evaluation, and her subsequent decisions were made in

reliance on Dr. Le's recommendation. But the call to Dr. Le had been made over four hours earlier, and Russell's symptoms had become far more serious. Yet, Nurse Teofilo did not call paramedics, nor did she call Dr. Le to ask whether the far more severe symptoms required anything more than the Motrin he had previously prescribed. The district court was correct in denying summary judgment on qualified immunity to Nurse Teofilo. A reasonable jury could conclude that she met the standard for deliberate indifference.

### 3.  Nurse Trout

Nurse Trout, though, is entitled to summary judgment on qualified immunity. When Nurse Trout saw Russell at around 1:08 a.m., she was aware that Russell was experiencing symptoms including nausea, vomiting, anxiety, rapid breathing, numbness in his hands and feet, and chest pain radiating to his arm and jaw. After she gave Russell a dose of nitroglycerin and his chest pain persisted, a reasonable person in her circumstances would have inferred that Russell was at serious risk if not hospitalized.

However, when Nurse Trout called Dr. Le and told him all of the symptoms that Russell had been experiencing, Dr. Le did not recommend hospitalizing him. Even though Russell was experiencing classic symptoms of a heart attack, Dr. Le recommended Motrin and a mental-health screening. No clearly established law would have put a reasonable nurse in Nurse Trout's position on notice that she could violate Russell's constitutional rights even while relying on Dr. Le's evaluation and recommendation. Therefore, Nurse Trout is entitled to summary judgment on qualified immunity. A jury could not, on the facts pleaded, reasonably conclude that Nurse Trout was deliberately indifferent. Though perhaps

she should have called paramedics, her having promptly called the physician on call and followed his instructions cannot be categorized as deliberate indifference.

## 4. Nurse Lumitap

Nurse Lumitap was responsible for Russell's care from around 7:00 a.m. until 12:20 p.m. on January 24. She was aware of all of the symptoms observed and recorded by Nurses Teofilo and Trout,[66] and, before Russell became unresponsive at 12:20 p.m., she personally observed him experiencing even more severe symptoms including vomiting, signs of physical distress such as hunching over and grasping his chest, fear about his condition, and deep throbbing pain in the middle of his chest and throat. At around 11:08 a.m. on January 24, Russell told her he had been diagnosed with high blood pressure in the past. She was also aware that Russell had been administered an ineffective dose of nitroglycerin. Drawing all inferences in plaintiff's favor, a reasonable person in Nurse Lumitap's position would have inferred that Russell was at serious risk if not hospitalized. By the time she came on duty at 7:00 am, Dr. Le's advice was 5 ½ hours old and Russell's symptoms were much worse than when Dr. Le had been called.

The record shows that, like Nurses Teofilo and Trout, Nurse Lumitap knew that Dr. Le had evaluated Russell over the phone and had not recommended hospitalization. However, Nurse Lumitap was responsible for Russell's care from around 7:00 am until 12:20 pm, between 5 ½ to

---

[66] Nurse Lumitap testified that she knew of the other nurses' assessments of Russell when she was evaluating his symptoms, and a jury could reasonably infer that she had read through their medical notes.

11 hours after Dr. Le had made his recommendation to administer Motrin. A reasonable factfinder could conclude that, after so much time had elapsed, and in the face of Russell's rapidly deteriorating condition, Nurse Lumitap was no longer in a position to reasonably rely on Dr. Le's recommendation from the night before without calling him again. She did not call for paramedics until Russell was unresponsive, and at no point did she call Dr. Le or any other physician for an updated recommendation in light of Russell's worsening symptoms. Her decision not to call Dr. Le (or whichever physician was then on call) at any point during that period suffices to raise a genuine dispute over whether it was clearly established that the care she provided was constitutionally adequate. Therefore, the district court was correct in denying qualified immunity to Nurse Lumitap.

*       *       *

Although Nurse Trout is shielded by qualified immunity because her actions did not violate then-existing clearly established law, there is at least a genuine dispute of material fact over whether Dr. Le's and Nurses Teofilo's and Lumitap's conduct violated clearly established law as it then stood. Therefore, we reverse the district court's denial of qualified immunity to Nurse Trout, and we affirm its denial of qualified immunity to Dr. Le and Nurses Teofilo and Lumitap.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**. Costs to be awarded in favor of plaintiffs-appellees.